ISAAC H. FRANCIS, Jr. *vs.* THE BRIGHAM HOPKINS COMPANY et al.

*Corporations—Salaries of Officers Held not to be Excessive—By-law Relating to Fixing Salaries— Vote by Director as to His own Salary as Officer.*

A bill by a stockholder against the corporation and some of its officers alleged that increases made in the salaries of certain officers by the board of directors, of which some of these officers were members, were excessive and unreasonable. Upon an examination of the evidence, *held* that the increased salaries were not excessive in view of the business and profits of the corporation, but were proper at the time when made.

When the salary of an officer of a corporation is fixed by the action of the board of directors in a meeting at which the presence of that officer himself as a director was essential, such action of the board is not void, but it should be closely examined by the Courts when attacked, and the burden of proof is upon such officer to show that no improper advantage was taken of the stockholders.

A provision in the by-law of a corporation that the compensation to be paid to its officers should be fixed by the board of directors prior to their election, is not mandatory but directory, and a resolution of the board fixing the salary of an officer after his election is not invalid merely because it was passed in violation of this by-law.

*Decided June 24th, 1908.*

Appeal from the Circuit Court, No. 2, of Baltimore City, when the following opinion was delivered by GORTER, J.

The Brigham-Hopkins Company, of Baltimore City, at the time of the occurrence of the acts in this suit complained of, viz., in the years 1905 and 1906, was a corporation duly incorporated under the General Laws of Maryland, having become so in the year 1890, when its certificate of incorporation was filed in the clerk's office of the Superior Court of Baltimore City.

Its business was that of manufacturing hats; · its capital stock at the time in question was $300,000 divided into 3,000 shares at the par value of $100 each, and were held as follows:

|  | Shares |  |
|---|---|---|
| Robert D. Hopkins | Shares | 1327 |
| Walter Hopkins | " | 158 |
| Isabel L. Hopkins | " | 175 |
| Robert D. Hopkins, Jr | " | 30 |
| William M. Hopkins | " | 8 |
| R. D. Hopkins, Guardian | " | 80 |
| Mrs. P. M. Brock | " | 16 |
| Mrs. Mary J. Platner | " | 37 |
| Walter C. Brigham | " | 58 |
| William T. Brigham | " | 11 |
| Estate—I. H. Francis | " | 1000 |
| W. Harry Francis | " | 50 |
| I. H. Francis, Jr | " | 50 |

Under the charter of this company its affairs were to be managed by four directors, and under its by-laws these were to be elected for one year at the general stockholders' meeting held on August 1st, of each year.

The directors for the year 1903 were: Robert D. Hopkins, Isaac H. Francis, William H. Francis and Walter Hopkins.

At the meeting of the directors on August 5th, 1903, all the directors being present, Robert D. Hopkins was elected president and treasurer, Isaac H. Francis was elected vice-president, Walter Hopkins was elected secretary, and the salary of each was fixed at $7,000 per annum.

The same directors were elected on August 1st, 1904, for the years 1904 and 1905. On the second of August, at the directors' meeting held · next day, the testimony does not show who were present, the same officers were elected and the same salaries fixed.

We now come to the proceedings held in 1905, the validity of which is called into question by the bill of complaint in this case. The stockholders' meeting was duly held and the same directors were re-elected.

On August 3rd, 1905, the directors' meeting was held. Those present were Robert H. Hopkins, Walter Hopkins, and William H. Francis. Isaac H. Francis, who was ill at the time, was not present.

The board elected: Robert D. Hopkins, president and treasurer; Isaac H. Francis, vice-president; Walter Hopkins, secretary, and fixed the salary for the president and treasury, Robert D. Hopkins, at $10,000, and the salary of the secretary, Walter Hopkins, at $8,000, thus increasing the former $3,000 more than the previous year and the latter $1,000 more than he had received the previous year.

The following motion or resolution was adopted:

"Owing to the present condition of the vice-president, his inability of rendering any assistance to the business for a period of two or more years, making it necessary for his son, to take his place, so far as the management of the male help is concerned and the general overlooking of that part of the business, we deem it just to both our vice-president and his son that the question of salary of each be left unsettled for future determination."

On September 25th, 1905, Isaac H. Francis died. On October 21st, 1905, a special meeting of the board was held to take action on Mr. Francis' death. Fitting resolutions were passed by the board. Robert H. Hopkins, Jr., was elected a director to fill the vacancy caused by the death of Isaac H. Francis.

Robert D. Hopkins resigned his position as treasurer, and Walter Hopkins resigned his position as secretary. W. Harry Francis was elected vice-president, the position formerly held by his father. Walter Hopkins was elected treasurer and Robert D. Hopkins, Jr., was elected secretary.

The salaries were fixed as follows:

| President | $10,000 |
|---|---|
| Vice-president | 3,000 |
| Treasurer | 8,000 |
| Secretary | 2,600 |

from July 1st, 1905, to June 30th, 1906. The salaries had always in the past been from July 1st to June 30th in each year.

The bill filed on May 20th, 1907, by Isaac H. Francis, Jr., a stockholder of the company, owning 50 shares of stock, attacks the increase of salary of $3,000 allowed to Robert D. Hopkins and the increase of salary of $1,000 allowed to Walter Hopkins upon the following grounds:

First, because the same is excessive and unreasonable.

Second, because each of the Hopkins was essential to the quorum only three being present.

Third, because contrary to the by-laws of the company which says: "That each shall receive for their salaries such compensation as shall be designated by the board previous to their election."

On August 7th, 1906, the general meeting of the stockholders took place at the corner of German and Paca streets, resulting in the election of the following directors:

| By vote | 1,399 |
|---|---|
| By proxy | 1,427 |
| | 2,826 |

Robert D. Hopkins, William H. Francis, Robert D. Hopkins, Jr., Walter Hopkins, notice being given each and acceptance of each received.

(Signed) ROBERT D. HOPKINS,
Acty. Secretary.

The directors' meeting was held on August 14th, 1906, and the minutes thereof are as follows:

BALTIMORE, MD., August 14th, 1906.

A meeting of the directors of the Brigham-Hopkins Company took place this day at their office. Owing to the absence of two directors it could not have been held before.

Present: Robert D. Hopkins, William H. Francis and Walter Hopkins.

Mr. William H. Francis was called to the chair and Walter Hopkins made          secretary.    Minutes of the last meeting read and approved, as well as annual meeting.

An election of officers to serve for one year took place, resulting in the following: Robert D. Hopkins, president; William H. Francis, vice-president; Walter Hopkins, treasurer; Robert D. Hopkins, Jr., secretary.

| | |
|---|---|
| Salaries were fixed for president, at............................ | $16,000 |
| Vice-president.......................................................... | 7,000 |
| Treasurer................................................................. | 11,000 |
| Secretary . ........................ ...................................... | 3,600 |

a year.

The plaintiff, Isaac H. Francis, Jr., in his bill of complaint, objects to the increase of salaries of the president and the treasurer over $7,000 a year.

First, because they are excessive and unreasonable.

Second, because as only three of the board were present, the presence of the president was essential to a quorum when a salary was voted, and the presence of the treasurer was essential to the existence of a quorum when his was voted.

Third, because they were passed in disregard of the by-laws.

(1) *Was the increase of salaries of R. D. Hopkins and Walter Hopkins for the years 1905-6 1906-7 reasonable?*

It seems to me that the first question that should be considered, is the unreasonableness *vel non* of the increase of salaries of the president and treasurer for the years 1905-6 and 1906-7.

Because, if such salaries are unreasonable and excessive, and the directors have abused their trust by voting to themselves or in any way assisting in getting the funds of the corporation for themselves, they would be held to account by a Court of equity. If on the other hand, the increase was just and proper, and only a fair compensation for the work done, the plaintiff must rely on some irregularity or invalidity in the proceedings to sustain his position, based upon some general principle of law, that the courts would feel bound to enforce, regardless of the merits or justice of the particular case.

This company was born out of the partnership of Brigham-Hopkins & Company. Mr. Brigham, Mr. Hopkins and Mr. Francis were prior to 1890, equal partners. They incorporated, and each took a salary of $100 per week, or $5,200 a year. The directors' minutes for 1891, shows that, Mr. Brigham was the president; Mr. Francis, the vice-president; Mr. Hopkins, the treasurer; Mr. W. I. Hopkins, brother of Robert D. Hopkins, was the secretary. They composed the board. The salary of the first three was fixed at $5,200 per year, and of the last at $2,340.

The directors' meeting for the year 1892, shows the same officers and the same salaries.

The directors' meeting for the year 1893, shows the same officers, and the same salaries, except that the secretary's salary was increased from $2,340, to $2,600. The directors' meeting for the year 1894 shows the same officers and the same salaries.

The directors' meeting of August 5th, 1895, shows those present, Messrs. Brigham, Francis and R. D. Hopkins. Mr. W. I. Hopkins having died.

The same officers were elected except that Mr. Hopkins assumed the office of secretary in addition to that of treasurer, and salaries of $7,000 each were voted.

The directors' meeting of August 7th, 1896, show the same three present, the election of the same officers and the same salaries.

The directors's meeting of August 3rd, 1897, show the same officers, except that Walter Hopkins is made secretary. The salaries of the vice-president and treasurer are increased to $7,000 a year and that Mr. Brigham's salary as president is reduced to $2,600. The reason was that Mr. Brigham had ceased to take an active interest in the business, having previously thereto moved to New York, and as the other two assumed the labor and responsibility of his duties, their salaries are increased.

The directors' meeting of August 5th, 1898, shows the same salaries were fixed.

Brigham, President.................................................. $2,600
Francis, Vice-President.............................................. 7,000
R. D. Hopkins, Treasurer................ ....................... 7,0co
Walter Hopkins, Secretary............................. ...... 2,600

At the directors' meeting August 8th, 1899, same officers were elected. The president's salary is reduced to $1,200 a year, and the amount taken off is added to the salary of the secretary, making the salaries as follows:

President.................... ..........................................  $1,200
Vice-President .......... ... ................ .... ......................  7,000
Treasurer.......... ....... ......... ......... ......................... ..  7,000
Secretary ............................................... . ..... ...... ..  4,000

At the directors' meeting August 8th, 1900, R. D. Hopkins was unanimously chosen president and treasurer; Isaac H. Francis was chosen vice-president, and Walter Hopkins was chosen treasurer. The salaries of R. D. Hopkins and Francis remain the same. The $1,200 from the salary of Mr. Brigham seems added to the secretary who got $5,200.

The diretors' meeting for August 6th, 1901, shows the same officers elected and the same salaries.

The directors' meeting for August 16th, 1902. shows the same officers, and each a salary of $7,000.

The directors' meeting for August 5th, 1903, shows the same officers were elected and same salaries fixed as previous year.

The directors' meeting for August 2nd, 1904, shows same officers and same salaries as preceding year.

We thus see the changes in salaries from the year 1890 to 1905. We see that as Mr. Brigham first began to take a less active part in the business, his salary lessened, going to the others who assumed the work and duties that he had ceased to perform. When Mr. Brigham's salary first drops from $5,200, to $2,600, we see the other two officers' salary increased from $5,200, to $7,000, half the amount taken off the the president's salary plus $500, added to the salary each of the other original members of the firm, who remained active.

In 1899, when the salary of the president, Mr. Brigham, is again reduced to $1,200, we see the $1,400 added to the

salary of the secretary, whose activity in the business no
doubt then began to be shown.

In 1900 when Mr. Brigham drops out entirely, we see his
salary added to the secretary's, brings it up to $5,200.

In the following year, we see Mr. Walter Hopkins' salary
increased to equal that of Mr. Francis' and his father's.    The
testimony shows the value of his services to the company at
the time, as well as the fact that the Hopkins family had pur-
chased the great majority of the Brigham stock.    So the sal-
aries remained for the next three years.

When we come to the year 1905, the testimony shows that
by reason of sickness, certainly for one year, but I find for the
period of two years, Mr. Francis had ceased to take an active
part in the business, and the work and responsibility of Mr.
R. D. Hopkins and Mr. Walter Hopkins had been thereby
increased.    No steps were taken during these two years to
lessen the salary of Mr. Francis, although his services to the
company had practically stopped.    The resolution of the
board of directors at their meeting of August 3rd, 1905, states
that he had been sick for two years, and that it was fair be-
tween him and his son, who was to some extent taking his
father's place in the factory, to defer action.    If the company
had continued to make the same profits after the sickness of
Mr. Francis that it did before, I think that he being totally
disabled from attending to business, and his work and the re-
sponsibility of the business falling thereby more on Mr. R. D.
Hopkins and Mr. Walter Hopkins, they in justice would have
been entitled to a greater compensation; and this as I have
shown in regard to Mr. Brigham, had been the policy of the
company, in which Mr. I. H. Francis, had taken part and by
which he had properly benefited.    But if I am right, the pro-
fits for the year 1904–5, had increased from $35,000, in
1903–4 to $60,000.    To have given Mr. R. D. Hopkins an
increase of salary of $3,000, and Mr. Walter Hopkins an in-
crease of salary of $1,000, with such increase as the other two
officers received, that is, W. H. Francis and R. D. Hopkins,
Jr., probably not altogether amounting to the $7,000, given

to Mr. Francis before his death, was not only not unreason-
able and excessive, but under the circumstances of the case,
most reasonable.

When we come to the directors' meeting of August 14th,
1906, we find that the profits of the company for the previous
year, have again greatly increased, amounting to $90,000.
The controlling spirit in the management of the company for
that year was certainly Mr. R. D. Hopkins, and next to him
his son, Walter Hopkins. Therefore, it strikes me, that the
increase of the salary of one $6,000, and of the other, $3,000,
over the previous years was not unreasonable or excessive.
This was a corporation that depended for its success upon its
management, just as much as the firm of Brigham-Hopkins &
Co. had done prior to 1890. Mr. Brigham had passed away,
Mr. Francis had died, and Mr. R. D. Hopkins, assisted by
his son, Walter, had produced the splendid results just spoken
of. After the death of Mr. Francis, Mr. Hopkins alone en-
dorsed the paper for the company, and controlled its policy.
Walter Hopkins on the other hand, had done so well in his
department, that had he for these and the previous years,
taken the usual commissions on his sales instead of the
salary allowed him, would have received a sum of $14,000 in
excess of what he did receive. The facts as disclosed by the
evidence and which are not contradicted, without regard to
the expert testimony, which was, however, clear and convinc-
ing, have brought me to the conclusion, that the increases of
the salaries of R. D. Hopkins and Walter Hopkins for the
years 1905–6 and 1906–7 were not excessive and unreason-
able, but just and proper. Were the acts of the board of di-
rectors on August 3rd, 1905 and August 14th, 1906, increas-
ing the salaries of R. D. Hopkins and Walter Hopkins, in-
valid, because the presence of each was necessary to make the
quorum.

The next question to be considered is the question as to the
validity of the acts of the directors at their meetings in August
3rd, 1905, and August 13th, 1906, in increasing the salaries of R.
D. Hopkins and that of Walter Hopkins. In addition to the ob-

jection that the salaries were not fixed until after the officers were elected, an objection that I will consider hereafter, it is strongly urged upon me that the fixing of the salaries of R. D. Hopkins and Walter Hopkins, was invalid as the salary of each was voted at a meeting of the board of directors when the presence of each was necessary to make a quorum.   The testimony in the case shows that R. D. Hopkins did not vote on the question of his salary, but the other two did.   It seems to me, that it would make no difference had R. D. Hopkins voted with the other two for his salary, and it would have made no difference had Walter Hopkins voted for his salary. It might not have strengthened the positions, but it certainly would not have weakened it.

So that after all, the question which must be decided is, under the circumstances of this case, were the salaries of R. D. Hopkins and Walter Hopkins legally increased at the directors' meetings of 1905 and 1906, disregarding for the present the operation and effect of the by-law, as to the time of fixing the same.

In the first case that I am referred to by the plaintiff's counsel, that of *Santa Clara Mining Company* v. *Meredith*, 49 Md. 400, I find the law laid down as follows:

To entitle a president or director of a corporation to recover for services rendered his corporation, he must prove an express contract of employment, if the services for which he claims compensation are within the line and scope of his duties as president or director.

But if the president or director of a corporation renders services to his corporation which are not within the scope of, and are not required of him in his duties as president, or director, but are such as are properly to be performed by an agent, broker or attorney, he may recover compensation for such services upon an implied promise.

Under which class of cases does this case actually fall?

In 1890, when the partnership was turned into a corporation, each partner became the holder of practically one-third of the stock.   As between themselves it made at that time no

difference whether they received their profits in the form of salary or of dividends.   They continued to devote their full energies to the management of the business.   Mr. Brigham did the buying and financiering; Mr. Hopkins did the selling, and Mr. Francis did the manufacturing.   They were not only directors, supervising the running of the business, but personally engaged, by their unremitting toil in the actual creation and prosecution of the business.   To it they gave their whole time and undivided attention.   In the late nineties Mr. Brigham sold out most of his stock, and most of it passed to Mr. Hopkins' family, some to Mr. Francis' family.   Fifty shares has passed into the hands of the plaintiff.   As such shareholder the plaintiff has his rights.   But the question we now are considering is: is the relationship of Mr. R. D. Hopkins and Mr. Walter Hopkins, to the plaintiff and the other stockholders of the company solely that of president and directors, or are they something more?   Do the services they have been rendering to the company only give them rights to compensation as president and director under the first class of cases in the report first quoted?   Or have they rights in addition thereto by reason of their relationship to the company, and the services they have rendered thereto, bringing them within the principle of the second.   Is it the duty of the president of a company to buy all its goods; attend to all its finances; endorse its paper to the extent of over $200,000 and to spend every minute of his business life in its service?   Or is it the duty of a director to take the active management of its great volume of sales, amounting to thousands of dollars?   In other words, no matter how much money these gentlemen may have made for the company by their ability, industry and energy, if it turned out that when their salaries were fixed, there was an irregularity or illegality in the manner of fixing them, they would be forever precluded from receiving a just or, indeed, any compensation for their work, but the fruits thereof would pass, unjustly into the pockets of others.   The officers of this company were never really paid salaries as directors or as officers.   Mr. Brigham was paid for the work

he did, in buying goods; Mr. Francis for his work in manu-
facturing goods, and Mr. Hopkins for his work in selling
goods.   So long as these gentlemen had the same interest in
the business, and their labor and responsibilities were the
same, no question could arise; but as soon as Mr. Brigham
ceased to take an active part, we see his salary lessen, although
he still remained president.   As his salary was reduced, the
salaries of the others were correspondingly increased, not be-
cause their obligations or duties as directors were changed,
but because the work they did in the running of the business
was increased.   When Mr. Brigham dropped out altogether,
and Mr. Hopkins took both the office of president and that of
treasurer, his salary was not increased, it remained the same
as Mr. Francis, who continued to hold the one office although
Mr. Hopkins and his family owned considerably more of the
stock than Mr. Francis and his family.   In other words look-
ing squarely at the matter, those who are paid salaries in this
company are not paid because they are the president, and
directors of the company, because of their labors; but because
of the exercise of business sagacity; because of their industry
and ability in the actual work of conducting the business of
the company.

It, therefore, seems to me that if no salaries had been fixed,
for these two gentlemen, Mr. Walter Hopkins ought to have
been entitled to commissions on the goods he has sold, or a
reasonable compensation, and Mr. R. D. Hopkins for work
he has done distinct from and outside of the duties of a presi-
dent or director.   Walter Hopkins sold for the year 1905-6,
goods amounting to $183,129.50 the usual commissions on
which would have been at 6% $10,987.77, and he sold for the
year 1906-7, goods amounting to $241,878.06, the usual
commission on which would have been $13,512.68, and Mr.
R. D. Hopkins by his efforts, his experience and ability pro-
duced for the stockholders $90,000 in net profits, after paying
all salaries.   Surely they should be entitled to compensation
for this work without conflicting with the principle that "the
president or director must prove an express contract of em-

ployment, if the services for which he claims compensation
are within the line and scope of his duties as president or
director." Did Mr. Francis get $7,000 a year for his duties
as vice-president or director, or did he get it for his services
in the factory? Were not the duties of Mr. Walter Hopkins
the same as director and secretary, when he got $2,600, as
when he got $5,200 or $7,000? Identically the same but his
value as a salesman had increased. *Waters* v. *Am. Finance
Co.*, 102 Md. 212,

It is said in *Morawetz on Corporations*, vol. 1. sec. 508, "Di-
rectors are not entitled to any compensation for their official
services as directors unless compensation is provided by the
charter or by-laws adopted by the majority. But if a director
is properly employed to perform services which do not pertain
to his office as director he is entitled to such compensation as
is agreed upon or as the services are reasonably worth." Is
this not all that the Hopkins are asking? Are not really the
services for which they claim compensation of the character
that do not pertain to the office of directors? I think if fixed
at all, under the circumstances of this case, Mr. R. D. Hopkins
and Mr. Walter Hopkins would have been entitled to reason-
able compensation for their services to the company. Again,
were the acts of the board of directors in August 1905 and
1906, in voting R. D. Hopkins an increase in salary and
Walter Hopkins an increase of salary illegal upon the grounds
that the presence of each was essential to a quorum?

*Article 2. Entitled "Board of Directors and their powers."*

Section 1.—Provides "there shall be elected from the stock-
holders, at each general meeting a board of four directors who
shall have charge and management of the property and busi-
ness of the company for one year, and until their successors
shall have been elected and accepted office, each of whom
shall be subject to removal by a majority of the board; they
shall have power to fill all vacancies from death or otherwise;
elect from their members a president, vice-president, secretary
and treasurer, who shall each serve for one year and until their
successor shall be elected and shall have accepted office, or

until their said offices shall be declared vacant by the board of directors, and shall each receive for their services such compensation as shall be designated by the board previous to their election, and shall incur such expenses as in their judgment will best promote the business of the company, they may make such rules and regulations for the government and conduct of the clerks and other employees of the company and the transaction and conduct of its business as they shall deem proper. At their regular yearly meetings in August of each year they may declare such dividends to the stockholders from the net profits of the business as in their judgment is proper. *At all meetings of the board of directors, three members thereof shall constitute a quorum.*

Here we have a by-law, making the board of directors to consist of four members; with power to select a president, vice-president, treasurer and secretary; with power to declare any one of these offices vacant; with power to fix their compensation; and concluding with the express provision—*"at all meetings of the board of directors, three thereof shall constitute a quorum."*

Is this last clause not equivalent to saying, that at the general meeting of the directors when they select officers and fix salaries, three shall constitute a quorum? Is not this meeting at which not only the officers are selected and the salaries fixed, but the dividend to the stockholders, declared the most important meeting of the board? And must this not have been fully in the minds of the stockholders when they adopted this by-law? What escape is there from the conclusion that when in the same by-law these powers are given to the directors, and the number constituting the quorum is fixed, that, the stockholders meant to say, that three of the board if present can do all the things authorized by the board to be done in this by-law. The plaintiff invokes the equitable principle that a man cannot occupy two inconsistent positions; he cannot act in a representative capacity in a matter where his personal interest is involved. The whole object and purpose of this principle is to safeguard those represented. But if

they authorize one to act for them or after the act is performed ratify it, what becomes of the principle.  Now, of course, the power conferred by this by-law for three to act, is only to act within the bounds of honesty and fair dealing; but when they have so acted, can it be said that their act is illegal, simply because they have done that which those they represented expressly authorized and directed them to do?    I do not understand it that way.

It seems to me that this by-law expressly authorized three of the board to constitute a quorum of the board, at a meeting when the board elects officers and fixes salaries.

It is said in *Cent. Digest*, vol. 12, sec. 1340, quoting from *McNab* v. *McNab*, 62 Hun 25, "Where the directors of a manufacturing corporation being also its officers, have by their management raised the company from insolvency to a high degree of prosperity, so as to pay large dividends and accumulate a handsome surplus their action in voting themselves an increase of salary as officers of the corporation, each one voting for the increase of all the others, but not voting for his own, is valid, in the absence of any evidence of combination or previous agreement or that the increases were unreasonable though the increases were all voted at one meeting of the board."    This case in its facts bears a strong analogy to the case under consideration.    But there were five directors present out of a board of six.    So that the man not voting was not necessary to the quorum.

In the case of *Bassett* v. *Fairchilds*, 61 Pac. Rep, 794, it is said on p. 795: "The contention of the respondent that the act of the board on November 9th, was invalid because the presence of Fairchilds was necessary to make a quorum is not maintainable.    There is a broad statement of this proposition of respondents in *Thompson on Corporation*, sec. 3929, but the authorities do not sustain the text.    In *Miner* v. *Ice Co.* 93 Mich. 97, it is decided that the majority of the quorum of the board must be disinterested in respect to the matter voted on.

"The Code (California) provides a majority is sufficient to form a board for transaction of business, and every decision

of a majority of the directors forming such board made when duly assembled is valid as a corporate act." The by-law of the Brigham-Hopkins Company just quoted declares the same thing.

There are but two cases to which I have been referred that hold, that or rather state, that an act of a board of directors is invalid, when the presence of a member, who is personally interested in the act is necessary to make a quorum. The first is the case of *Butts* v. *Wood*, 37 N. Y. 318. In this case the effect was to allow an invalid claim, at a meeting of a board of directors consisting of five, at which only three were present. D. W., the party to whom the claim was allowed, his father, and a relative.

In the opinion of the Court it is said "A careful examination of the testimony in this case shows that D. W. could not have enforced his claim against the company, and the circumstances under which it was allowed and paid was a fraud upon the stockolders."

The second case that states this doctrine is the case of *Martin* v. *Santa Cruz*, Arizona (36 Pac. Rep. 36). In that case three directors of a board of five on February 3rd, 1891, elected one of their number secretary, at the same time passing a by-law creating the office, but fixing no salary. The same three directors met again June 20th, and fixed the salary at $1,800 a year to begin in February, 1891, five months prior thereto. "The appellant cast his vote for this resolution, otherwise it was never passed at all, for his vote was essential to its adoption. This sufficiently appears from the record." Then further on in the opinion we find the dictum, for it was not necessarily involved in the decision of the case, the following, "They cannot properly act on nor form part of a quorum to act on, a proposition to increase their compensation. *Bank* v. *Collins*, 7 Ala. 75." An examination of the case of *Bank* v. *Collins*, shows an expression of opinion upon the point now being considered.

The plaintiff's counsel contends that the act of the board in August, 1906, in regard to the salary of R. D. Hopkins

was invalid, indeed void, because Mr. R. D. Hopkins' presence was essential to a quorum, and the act of the board in regard to the salary of Walter Hopkins was void, because his presence was necessary to a quorum.

And this notwithstanding the fact that the action of the board in voting such salaries, was proper and just; that the compensation was only such as should be reasonably allowed for the services, that the by-laws, had directed the board to fix the salaries, and declared three to be a quorum, and that in all probability if the other director had been present the result would have been exactly the same and the salaries were practically fixed in advance, so that any stockholder would be at liberty to inquire into the reasonableness of the amounts. I do not think that public policy requires a doctrine so inflexible to safeguard the rights of stockholders.    I think there is a wide distinction between a person voting for something that is to his personal advantage, when that vote is essential to his getting such benefit, and his constituting a quorum, a bare majority of a board, when it is considering a subject in which he is interested.

In the one case he takes part in a matter in which his duty and his interest may conflict, in the other he only makes possible a body, that is able to pass upon the question in a disinterested and impartial manner.

Suppose there were a board of 21 directors, and 11 were present at a meeting, 11 being necessary to a quorum, and the salary of one is fixed by a vote of the other 10, is there any reason why such an act should be void?    When there would have been the same result had 19 been present and 9, including the person interested, voted against the salary.

It seems to me that even where one votes for his salary in a board where he is given the authority to act by the by-laws adopted by the stockholders, and his vote is essential, the act so done should not be absolutely void, but should be subject to close scrutiny by the Courts, with the burden of proof upon the person benefited by the act, to show that it was just and proper, and that no advantage was taken of the stockholders.

But I do not have to go so far to decide the question we are now considering. I am of the opinion, bearing in mind the nature of the services and the by-law of the company, that salaries voted to R. D. Hopkins and Walter Hopkins in August, 1905, and August, 1906, were not rendered invalid because only three members of the board of directors were present at such meetings.

It might be added that the minutes of the meetings of the board of directors at which salaries were fixed, were composed in a number of instances of only three members.

(*3*) *Should the offices be filled before salaries fixed ?*

It is also contended as the election of the officers took place before the fixing of the salaries, the proceedings are illegal, as being in conflict with the by-laws already quoted. The by-law after providing for the election of the president, vice-president, treasurer and secretary, and for the term of their office adds, "and shall each receive for their services such compensation as shall be designated by the board previous to their election."

A great deal that I have already said bears upon this question. I do not think, that this provision of the by-laws as applicable to this company is mandatory. Certainly those in charge of its affairs, who at one time were the holders of all the stock have never so considered it. For from the beginning the minutes of all the meetings disclose that the officers were elected before the salaries were fixed.

Indeed, as I have endeavored to show the salaries were not adjusted according to the duties of the offices, but according to the usefulness and work of the person who happened to hold the office. Mr. Walter Hopkins would have sold just as many goods had he been secretary instead of treasurer or held no office at all. Mr. R. D. Hopkins, would have rendered practically the same services, had he been vice-president instead of president, and Mr. Francis would have had control of the factory during his life, no matter which of the offices he might have filled. I can see no purpose, that under the circumstances of this case, would be subserved in compelling

the directors to fix salaries before officers were elected.  In-deed, in a company like this, what possible difference can it make, whether the salaries are fixed immediately before, im-mediately after or simultaneously with the election of the sev-eral offices.  In other words, it is not the place, under the facts as they have existed since the incorporation of this com-pany, that controls, or should control the salary, but the man that fills the place.

The duties of the office of president were the same, whether occupied by Mr. Brigham when he bought all the goods for the company as when he took no active part in its affairs. But in the first instance he was entitled to $7,000 a year and only $1,200 in the last.

(4) If I understood the plaintiff's attorney, he contended that as the salaries were fixed in August, to relate back to July 1st, this could not be done.  If such were his contention I think it is answered by an examination of the by-laws.

Article 1, section 1, requires the stockholders' meeting to be held on the first Monday in August.

Article 3, section 3, requires the treasurer to furnish at said meeting a full statement of the business of the company of the preceding year.

Article 4, section 2, provided that at the meeting of the stockholders the directors shall be re-elected.

It, therefore, seems clear that the by-laws contemplated the fiscal year to have closed prior to the first Monday in Au-gust, a sufficient time intervening to have made up the state-ment of the business of the company.

The directors could of course only assemble after they had been elected, and fix salaries, which would have to relate back to the beginning of the fiscal year which then must have been under way.

In conclusion I think that while the action of a board of directors, constituted as this was, in fixing their salaries, should be subjected to careful scrutiny by the Courts, yet, if the Court should reach the conclusion as I have in this case, that the salaries were reasonable and just, and only a fair com-

pensation of the work done, they should not be interfered with.

It follows from the conclusions reaehed upon the several points so ably presented by the counsel in the case, that the bills should be dismissed.    I will sign a decree so ordering.

The cause was argued before Boyd, C. J., Briscoe, Pearce, Schmucker, Burke and Worthington, JJ.

*William S. Bryan, Jr.,* for the appellant.

1. The increase of salary which the Messrs. Hopkins, while in control of the Brigham-Hopkins Company, caused to be awarded themselves was not a fair and reasonable compensation for the services rendered by them to the Brigham-Hopkins Company.

(*a*) It is not at all satisfactory to depend on the opinion evidence of the business friends of the appellees to ascertain the value of their services.    This Court knows how easy it is to get certificates from counsel of the highest standing as to the reasonableness of a fee, which no responsible Court would dream of allowing.    It is not a gracious thing for any man in active business to refuse to assent to the estimate which a fellow craftsman places upon the value of his own services. Therefore it is submitted that no weight should be placed upon the opinions expressed by Messrs. Rosenthal and Montague. It is, moreover, significant that, notwithstanding their large business interest, the Messrs. Hopkins were only able to produce these *two* witnesses out of their necessarily large business acquaintance to vouch for the fairness of their charges.

(*b*) It is fallacious to assume that, because the profits of the Brigham-Hopkins Company have increased of late years, there should be a corresponding increase in the salaries paid the officers of the company.    If, through hard times, or unavoidable misfortune, the profits had decreased, no reasonable man would suppose that it would be improper or unreasonable to continue to pay the same salaries to the officers for doing the same work.

These officers should in reason, and in the absence of express contract, receive what their services are fairly worth—neither more nor less—and they should in reason and in the absence of express contract, receive the value of their services without regard to whether the business of the company has been successful or the reverse.   There is no analogy between what is fair salary to be paid to a corporation officer who is to receive his wage in any event, and what would be a fair contingent fee to be paid out of the net earnings of the company if there should chance to be net earnings.   No one would imagine that the salary of the president of the Baltimore and Ohio Railroad should be increased if the receipts of the road were larger than usual, or decreased if those receipts should chance to fall off.

(*c*) The best test perhaps of the real value of the services of the Messrs. Hopkins is the estimate which they themselves placed upon them, and the sum which they themselves were willing to accept during the time when the health and vigor of their colleague, the late Mr. Isaac H. Francis was sufficient to curb their rapacity.   No one can candidly claim to believe that the value of Mr. Robert D. Hopkins' services increased at a single leap in August, 1905, and as soon as Mr. Francis was too sick to attend the company's meeting from $7,000 (which Mr. Hopkins for a long time had been content to receive) to $10,000.

Nor can anyone, it is respectfully submitted, reasonably claim that Mr. R. D. Hopkins' services in some miraculous and unexplained way increased from $10,000 to 1905 to $16,000 in 1906.   He was, so far as the record shows, just as able and just as experienced in 1903 or 1904, when he was receiving without remonstrance $7,000 a year, as he was in 1905 when he received $10,000, or as he was in 1906 when he received $16,000.   It is not credible that the value of this man's services more than doubled in two years; nor can we believe that his son, Mr. Walter Hopkins, had his earning capacity suddenly increased from $7,000 in 1904 to $8,000 in 1905 then again to $11,000 in 1906.

The Hopkins family owned about two-thirds of the stock of the Brigham-Hopkins Company and received $14,000, out of $21,000 paid as salaries in 1904. In 1905, when the restraining influence of the presence of the representative of the little over one-third of the stock held by the minority stockholders, the Francis family—was removed by, first, disease, and then death, these majority stockholders at once increased the salaries paid to the representatives of themselves the Hopkins family, to $20,600, and cut down the salary paid to the single representative of the Francis family to $3,000.

On October 31st, 1905, on the very day and at the very board meeting at which the Messrs. Hopkins passed resolutions in respect to the memory of Mr. Isaac H. Francis, the business associate of Mr. Robert D. Hopkins for nearly thirty years, these thrifty men fixed the salary of Mr. Robert D. Hopkins at $10,000; of his son, Mr. Walter Hopkins, at $8,000; of his other son, Mr. R. D. Hopkins, Jr., at $2,600; in all, $20,600, while Mr. W. H. Francis was elected to the position formerly held by his father, with a salary of $7,000 with the reduced salary of $3,000.

The thing speaks for itself. It is respectfully submitted that a Court of equity cannot "wink so hard" as not to see that the Messrs. Hopkins, under the guise of increasing their own salaries, were in fact diverting into their own pockets the money which in truth and honesty ought to have been shared ratably by all the stockholders of the company.

That neither the majority stockholders nor the directors can loot the treasury of a corporation by voting themselves excessive salaries is settled by the authorities. *Wayne Pipe Co.* v. *Hannons*, 129 Indiana, 368; *Blatchford* v. *Ross*, 54 Barb. 42, 48; *Davis* v. *Memphis City Railway Co.*, 22 Fed. Rep. 883; *Sellers* v. *Phœnix Iron Co.*, 13 Fed. Rep. 20.

2. It is submitted, however, that it is immaterial what was the value of the services of the Messrs. Hopkins to the Brigham-Hopkins Company. If the increase of the salary of each of the appellees was brought about by an illegal act on their part, then of course no matter whether their former sal-

aries were adequate or not, the unlawful increase can not be maintained. *Graves* v. *Mining Co.*, 81 Cal. 304, 320. On this theory the appellant filed exceptions to all the testimony as to the value of the services rendered to the Brigham-Hopkins Company by either of the Messrs. Hopkins.

3. The reasons why the attempts to increase the salaries of the Messrs. Hopkins were unlawful and manifold.

(*a*) The answer of the Brigham-Hopkins Company admits, "that it has been the custom of this company for some years to have its fiscal year end on June 30th, but not to hold its annual meeting until August of each year."

Therefore when the salaries of the Messrs. Hopkins were increased in August, 1905, and again in August, 1906, the action of the board gave *back pay* to the Messrs. Hopkins for the preceding month of July and for the days which had already passed in August before the meeting was held.

It is unlawful for the directors of a corporation to vote any officer thereof back pay; *a fortiori*, is it illegal for them to vote *themselves* back pay? *State* v. *People's Mut. Ben. Asso.*, 42 Ohio St. 579.

(*b*) It was clearly illegal for either Mr. R. D. Hopkins or Mr. Walter Hopkins as directors of the Brigham-Hopkins Company to be the effective agents in increasing their own salaries. *Booth* v. *Robinson*, 55 Md. 441.

The principle runs all through the law that a fiduciary can not obtain any personal advantage by dealing with his trust. It is recognized everywhere as both illegal and dishonest for a trustee to purchase at his own sale. "The directors of a corporation are subject to the obligations which the law imposes on trustees and agents. They can not, therefore, with respect to the same matters act for themselves and for it, nor occupy a position in conflict with its interests." *Wardell* v. *Railroad Co.*, 103 U. S. 651; see also, *C. C. and I. Co.* v. *Parrish*, 42 Md. 598, 605; *Clark Co.* v. *Colton*, 91 Md. 214 215; 1 *Morawetz on Corporations*, sec. 517.

"The general rule will be conceded that an officer of a corporation can not use his official position for his own advantage,

can make no valid contract with himself personally, and can not represent the corporation in any transaction in which he has a personal interest." *Tuskaloosa Cottonseed Oil Co.* v. *Perry*, 85 Ala. 116.

Directors of corporations can not contract with themselves. *Thomas* v. *P. & R. I. Ry. Co.*, 36 Fed. Rep. 815.

It has been held illegal in many Courts of authority for directors of a corporation, by passing by the aid of their own votes, a resolution in a meeting of the board of directors to remove the bar of limitations from a claim due to themselves as individuals by the corporation. *Lowndes* v. *Garnet Mining Co.*, 10 Law Times Reports (N. S.) 229; *Coleman* v. *Second Ave. R. R.*, 38 N. Y. 201; *Butts* v. *Wood*, 37 N. Y. 317.

Resolutions passed by the vote of interested directors of a corporation making allowances in their own favor are voidable at the election of the corporation, or at the election of a minority of the stockholders of the corporation, if the corporation refuses to avoid them, *without regard to whether they were fair and honest or not. Graves* v. *Mining Co.*, 81 Cal. 304, 320.

A director can not vote himself an increase in salary; and an increase of salary for a director being carried by his vote is void. *Ward* v. *Davidson*, 89 Mo. 445, 450; *Jones* v. *Morrison*, 31 Minn. 140, 148; *Butts* v. *Wood*, 37 N. Y. 317, 319; *Copeland* v. *Johnson Mfg. Co.*, 47 Hun. 235, 236; *McMilton* v. *Bank*, 164 Ill. 427, 448; *Railway* v. *Woodward*, 46 W.Va. 558; *Wickersham* v. *Crittenden*, 93 Cal. 17, 31, 32; *Harris* v. *Lemming-Harris Co.*, 43 S. W. Rep. 869; *Cumberland C. & I. Co.* v. *Parrish*, 42 Md. 605; 21 *Am. & Eng. Ency. of Law*, (2d ed.) 910; *Mallory* v. *Mallory Wheeler Co.*, 61 Conn. 131; *Same case*, 23 Atl. Rep. 710, 712; *Martin* v. *Santa Cruz Co.*, 36 Pac. Rep. 36; *Duncomb* v. *Railroad Company*, 84 N. Y. 190.

A director of a corporation can not make *any use* of his position for his own advantage. *Wickersham* v. *Crittenden*, 93 Cal. 29; *McNulta* v. *Corn Belt Bank*, 164 Ill. 448.

A director can not properly act *or form part of a quorum to act* on a proposition to increase his own compensation. *Jones*

v. *Morrison*, 31 Minn. 148.    See also *Hax* v. *Davis*, 89 Mo. App. 459, 460.

In the leading case of *Butts* v. *Wood*, 37 N. Y. 318, it was held that Daniel Wood being the director claiming the benefit of the resolution of the board of directors was disqualified from acting because he could not deal with himself, and without him there was no quorum of the directors and they had no authority to transact business.    See *Copeland* v. *Johnson*, 47 Hun. 235; *Burr* v. *N. Y. Life Ins. Co.*, 66 Hun. 75; *U. S. Ice Co.* v. *Reed*, 2 How. Pract. (N. S.) 253; *Wickersham* v. *Crittnnden*, 106 Cal. 327; *Same case*, 110 Cal. 332; *Ashley* v. *Kinman*, 2 N. Y. Sup. 574.

It is somewhat difficult to undersand how the fact that *three* of the four directors constituted a quorum, of the board of directors, which board had power to elect officers *and before their election* fix their compensation, is any evidence of any intention to allow any one of the directors to act for himself and the corporation, at the same time.

This same by-law gives the board of *four* directors—of whom *three* shall constitute a quorum—the right to "have charge and management of the property and business of the company for one year and until their successors shall have been elected and accepted office."

Could any one imagine that a resolution would be valid which was passed at a meeting of the board when three only of the directors were present, selling a large assortment of the goods of the company to one of these three directors whose presence was necessary to constitute a quorum but who did not vote with his colleagues on the question as to whether the property of the company should be sold to himself, one of the trustees of the company?

It is submitted that what is meant when the by-law says that three members of the board shall constitute a quorum, is that three members of the board of directors, *capable of lawfully giving their attention and judgment to the business of the company which is being transacted*, shall constitute a quorum. A director who could not either by his vote or advice aid in

transacting the company's business before the board of direct-
ors would be of no benefit to the company and might as well
be absent.    There is reason in the law.

(*e*) The by-law just quoted shows that it was in conflict
with the rule laid down in that by-law for the directors to
select the officers and *then* afterwards fix their salaries.

(*f*) Unless the resolutions increasing the salaries of the
Messrs. Hopkins were properly passed so as to be legally
effective, those defendants can recover or retain nothing over
the $7,000 a year fixed as their salary before 1905. They can
get nothing on the theory that they are entitled under a *quan-
tum meruit* because their services were worth it.

The law of Maryland as to the right of officers and directors
of corporations to receive compensation for their work is set-
tled by the authorities.    *Santa Clara Mining Co.* v. *Meredith*,
49 Md. 389, *Waters* v. *Finance Co.*, 102 Md. 212.

*Edgar H. Gans* and *Vernon Cook*, for the appellees.

The first matter to be considered is the question of fact
whether or not the salaries voted to the Messrs. Hopkins
were fair and reasonable in view of the services performed by
them.    The testimony on this point is all one way.    The
plaintiff, notwithstanding the harsh language used in his bill
in referring to these salaries, has not offered a single witness
to show that they were unreasonable or to dispute in any way
that the Messrs. Hopkins do actually render the services
which they claim to have rendered.    The plaintiff, Isaac H.
Francis, Jr., did not even take the stand on his own behalf to
give a single fact tending to support the allegations of his bill.
He is the holder of but fifty shares out of a total of three
thousand shares issued and outstanding.    That is to say, his
holding is less than two per cent of the total stock of the
corporation.

A minority stockholder has no standing in a Court of
equity except in the case of *ultra vires*, illegal or fraudulent
transactions.    In all other cases they must seek redress within
the corporation.    *Callaway* v. *Powhattan Company*, 95 Md.

185; *Dupuy* v. *Terminal Co.*, 82 Md. 408-426; *Booth* v. *Robinson*, 55 Md. 419, 439, 440-1.

For a case in which large increases in salaries were sustained, though the business had not been successful, we cite: *Hedges* v. *Pacquett*, 3 Ore. 77. Other strong cases are: *McNab* v. *McNab*, 62 Hun. 25; *Fillsbrown* v. *Haywood*, 77 N. E. Rep. 46; *Biseler* v. *Summerfield*, 70 N. E. Rep. 1059.

The general doctrine as laid down by these cases is that where the corporation is successfully managed and there is no fraud, the Courts will not interfere with increases of salaries which are not unreasonable.

Irrespective of the question of the technical regularity or irregularity of the votes determining the salaries, the Messrs. Hopkins were on the theory of a *quantum meruit* entitled to at least the amounts which they have received.

When the officers of a corporation perform duties of this character, which are not within the ordinary duties required of such officers, but are such as are properly performed by an employee, the officer may recover compensation without any vote whatever and without any express contract, the recovery in such cases being on the ordinary theory of an implied promise and the amount of recovery being a fair and reasonable compensation for the services performed. This is clearly laid down in *Santa Clara Mining Co.* v. *Meredith*, 49 Md. 390.

It is true, as contended by the appellant that in some of the decisions expressions of *dicta* can be found to the effect that an interested director cannot be counted in making up a quorum when the board is voting on a matter in which he is personally interested. It will be found on examination, however, that these are either cases in which the facts show that some gross and glaring fraud was being perpetrated on the minority stockholders, or they are cases where the language used is purely and absolutely *obiter dictum*. In the first class belongs the case of *Butts* v. *Wood*, 37 N. Y. 318.

In the second class belongs the case of *Martin* v. *Santa Cruz*, 36 Pac. Rep. 36.

There are also a few cases in which the language used might seem . to support the appellant's proposition, but in which the facts show that not only was the presence of the interested party essential to the making up of a quorum, but that the vote of such party was also essential to the passage of the resolution.    Such cases are *Wickersham* v. *Crittenden*, 93 Cal. 18; *Railway Co.* v. *Woodyard*, 46 W. Va. 563; *Ward* v. *Davidson*, 89 Mo. 453.

Against these authorities we call attention to the following cases in which it is flatly held that an interested director may be counted in making up a quorum provided his vote is not also necessary to make a majority in favor of the resolution. *Buell* v. *Buckingham*, 16 Iowa, 287-8; *Bassett* v. *Fairchild*, 61 Pac. Rep. 791.

Other instructive cases are:  *Clark* v. *American Coal Co.*, 86 Iowa 436; 17 L. R. A. 558, 563; *Hax* v. *Davis*, 39 Mo. App. 454.

In the former it was held that a director's vote for his own salary does not render the proceedings void where the result would have been the same had he not voted.    In *Hax* v. *Davis* there were four directors, two voted for the salaries, one against, one interested was present but did not vote. This was held good.

When we look at the reasoning which may be offered for or against the rule for which the appellant contends, viz., that an interested director cannot be counted in making up a quorum, it seems to us that the sound view is evidently that of the cases in our favor.

Boards of directors like most other deliberative bodies are authorized to act when a quorum is present.    This quorum, in the absence of any rule to the contrary, is a majority of the board, and when a quorum is present a majority of the quorum, though less than a majority of the whole board, may lawfully pass any vote.

It may be argued with much force that an interested director ought not to be allowed to vote in favor of a resolution in which he is personally interested.    Yet even in this

case, suppose his vote is not necessary to the passage of the resolution. In such event no harm is done, and it has been held that his voting does not make the resolution invalid.

Likewise when an interested director is present, but does not vote, what harm is done by his mere presence? If he should vote *against* the resolution offered in his favor, the result would be exactly the same, *i. e.*, the resolution would pass despite his opposition, and surely it could not be said that he was improperly using his fiduciary position for his own interest when he votes against that interest.

If three constitute a quorum at *all* meetings, then three constitute a quorum at the meeting at which salaries are fixed. As the directors elect officers from their own number, it is inevitable that one of the three present will always be interested in the result of a vote on salaries. The result then would be according to the appellant's line of argument that no salaries could ever be legally fixed at a meeting of three directors, except perhaps the salary of the absent man, and the appellant reaches this result in the face of the express provision that three shall be a quorum at all meetings.

Again, even if all four were present and A, B and C fixed the salary of D, and then A, B and D fixed the salary of C, then A, C and D the salary of B, and finally B, C and D the salary of A we would still have substantially the same position that we find in the record, and would doubtless find the same argument made that the net result of these four votes is that the directors collectively, if not individually, are fixing their own salaries. Yet in what other way could they possibly act?

The conclusive answer to the appellant's argument, however, is that irrespective of the broader question of the right in the ordinary case of an interested director, to vote or to be counted in making up a quorum, the stockholders may by their *consent* remove any restriction of this kind that would rest on directors under the ordinary rules applying to fiduciaries, and that they have so *consented* in this case.

The second contention made by the appellant is that inas-

much as the by-laws state that the officers "shall each receive for their services such compensation as shall be designated by the board previous to their election" this language must be complied with literally, that is to say, that the directors must, prior to the election of officers, pass resolutions determining the salaries of the officers about to be elected, and subsequently to the passage of such resolution must elect the officers. It is contended that if this is not done the vote is utterly null and void, and that under such circumstances the officers are not entitled to receive any compensation whatsoever, although they have devoted their whole time and attention to the work of the corporation.

It will be seen at once that this contention is purely technical and we think extremely artificial. Our position is that the provision of the by-law is, at most, directory merely, and not mandatory. A Court of equity should certainly not go out of its way to bring about such a harsh result as to hold that these officers are entitled to nothing for their services simply because of the chronological order in which certain votes were taken at a meeting of the board. It must be apparent to any one that the result in every sense would have been the same had the salaries been fixed first and the officers elected thereafter; in fact, there is no positive evidence to show what the order of proceedings was at the meeting.

The next contention made by the appellant is that inasmuch as the meetings under discussion were held in one case on August 3rd, 1905, and in the other case on August 14th, 1906, the salaries voted at these respective meetings could not lawfully be made to run from the first of the preceding month.

This suggestion, we also submit, is certainly extremely technical. It is true that there are many cases which hold that directors cannot vote themselves back salary, but it will be found on examination that all of these are cases where directors have attempted to give themselves a salary for a past period of time, usually a year or more, and where they have made such salaries in excess of anything contemplated

either by themselves or the corporation during the time at which their services were rendered.

The situation in this case, however, is entirely different. The fiscal year of this corporation began on July 1st. The annual meeting of stockholders is fixed by the by-laws for the first Monday of August. We think the reason for this is obvious. It is usual, in most corporations, to have the annual meeting of stockholders a short time after the beginning of the fiscal year in order to give the treasurer and other officers of the company a reasonable time to prepare their annual statements and submit the same to the meeting of stockholders. The by-laws also provide that this annual meeting of stockholders shall elect the directors and that the directors, in turn, shall elect the officers. Of course, the directors cannot meet until they are elected and, therefore, under the scheme of the by-laws, it would have been impossible for the directors to elect officers and fix salaries any sooner than they did, and it was the evident understanding of everybody connected with this corporation that the directors at their first meeting were to fix the salaries of the offices for the current year; that is to say, the year beginning July 1st. Everybody concerned must have known that the officers from and after July 1st were working for salaries to be fixed at the coming meeting of the board, and this case, therefore, is in no sense like those cited by the appellant, in which the action of the directors has been condemned in attempting to vote officers a salary for services rendered long previously and for an amount in excess of the contemplation of either the officers or the stockholders.

PEARCE, J., delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court No. 2, of Baltimore City, dismissing the plaintiff's two bills of complaint in certain consolidated cases which will now be explained.

The first bill was filed by Isaac H. Francis, Jr., as stockholder, against The Brigham-Hopkins Company, a corpora-

tion under the laws of the State of Maryland, and Robert D. Hopkins. The plaintiff sued, not only in his own behalf, but also on behalf of all other stockholders of the said Brigham-Hopkins Company, who should come in and contribute to the expenses of the suit.

The bill alleged that during the years ending July 1st, 1903, 1904, and 1905, respectively, Robert D. Hopkins was president and treasurer of said corporation, with a salary of $7,000 per annum; that Isaac H. Francis, since deceased, the father of the plaintiff, was vice-president and manager, with the same annual salary; that Walter Hopkins, was secretary, with the same salary, and William Harry Francis, another son of Isaac H. Francis, was a director and foreman, and received a salary of $1,560. That the stock of said corporation was divided into 3,000 shares of the par value of $100 each, of which at the time the bill was filed, 1,327 shares were held by Robert D. Hopkins, 1,000 shares by the estate of Isaac H. Francis, deceased; 158 shares by Walter Hopkins; 50 shares by William Harry Francis, and 50 shares by the plaintiff, Isaac H. Francis, Jr., and the remaining 415 shares were held among other members of the Hopkins and Brigham families.

The bill further alleged that before the end of the fiscal year ending June 30th, 1905, Isaac H. Francis became ill, and was unable to attend the regular stockholders meeting on August 1st, 1905, and died September 25th, 1905; that at the meeting of August 1st, 1905, Robert D. Hopkins, Isaac H. Francis, Walter Hopkins and William Harry Francis were elected directors of said company, and that on August 30th, 1905, a meeting of said directors was held at which all were present except Isaac H. Francis, who was still ill, but who, it is charged, received no notice of said meeting. At that meeting the officers above named were re-elected to their respective offices.

The bill further charges that at said meeting "the directors went through the form of fixing the salary of Robert D. Hopkins at $10,000 a year and that of Walter Hopkins at $8,000," and also "went through the form of passing a resolution" that

the inability of the vice-president to render any assistance for the past two years to the business, made it necessary for his son, William Harry Francis, to take his place, so far as the management of the male help was concerned, and the supervision of that part of the business, and that it was deemed proper to leave the question of the salaries of Isaac H. and William Harry Francis to be settled thereafter.

That at a meeting October 21st, 1905, Robert D. Hopkins, Jr., was elected a director in place of said Isaac H. Francis, then deceased; that Robert D. Hopkins resigned as treasurer, retaining the position of president, and Walter Hopkins resigned as secretary. William Harry Francis was elected vice-president for the unexpired term of his father. Walter Hopkins was elected treasurer and Robert D. Hopkins secretary. Salaries were then fixed as follows: President, $10,000; vice-president, $3,000; treasurer, $8,000; secretary, $2,600.

On August 7th, 1906, the same officers were elected, and the same form was gone through for a further increase of salaries as follows: President, $16,000; vice-president, $7,000; treasurer, $11,000; secretary, $3,600.

The bill then charges "that the above recited increases in the personal salaries of the Messrs. Hopkins were illegal and void (1) as in violation of sec. 1 of Art. 2 of the by-laws o said company, which provides that the compensation to be paid the president, vice-president, treasurer and secretary ʻʻshall be designated by the board previous to their election." (2) Because it was not competent for Robert D. Hopkins and Walter Hopkins after they had been elected and had assumed the fiduciary position of directors, to vote to themselves an increase of salary, and that it was not within their power to represent and act for that corporation in a matter in which they have a personal interest in conflict with the interest of the corporation.    (3) And because $7,000 a year is a reasonable and adequate salary to compensate either Robert D. Hopkins or Walter Hopkins for any services which they have rendered, or are capable of rendering to the corporation; and that the salaries so voted are excessive and unreasonable and that the

voting of them is an unlawful and covert method on the part of the Hopkinses, as the owners and controllers of a majority of the stock, to divert into their own pockets money which should rightfully go as dividends to all the stockholders *pro rata*.

The bill further charges that the two Hopkins above named, who control said company have been unwilling to allow the estate of said Isaac H. Francis the salary due him at the rate of $7,000 per annum from July 1st, 1905, to the date of his death, September 25th, 1905.

Also that the plaintiff had before filing his bill, made written demand on said company to compel Robert D. Hopkins and Walter Hopkins to make restitution to said company of the excess of salaries over $7,000 per annum received by each of them, with which demand said company refused to comply.

The prayer of the bill is that the Brigham-Hopkins Company be enjoined from paying any further salary to Robert D. Hopkins until after such time as the salary theretofore received by him, will, if calculated at $7,000 a year, pay him for the services which he shall then have rendered said company, and that he be required to account with said company, and repay it, with interest at six per cent per annum from the date of their wrongful receipt by him all sums in excess of $7,000 a year; and for such other and further relief &c.    A similar bill was filed by the plaintiff on the same day against Walter Hopkins—making the same allegations and praying the same relief, and the two causes, by agreement, were consolidated, and heard and determined together.

The defendant corporation answered, admitting the allegations as to its incorporation, the amount of its capital stock, and the holding of the shares among its stockholders; also, that the salaries voted the various officers are correctly stated in the bills; but alleges that Isaac H. Francis had been ill for four years prior to June 30th, 1905, and that for two years before his death he had been able to render very little assistance to the business, and was very little at the factory, though he was allowed for the full four years to draw his salary of

$7,000. It alleges that the meeting charged in the bill to have been held August 30th was in fact held on August 3rd, and that due notice thereof was given to said Isaac H. Francis, and that the plaintiff also received prompt notice of all said increases of salary, and is guilty of laches in objecting thereto.

It alleges that the provision of the by-law mentioned in the bills, is directory merely, and not mandatory, and that the spirit of the same has been in no way violated by any act of any of the defendants.

It alleges that all the salaries voted are fair and reasonable, and that the increases from time to time therein have not been proportionately more than the increase in the volume of business and the net profits of the company; and that the officers devote their whole time to the management and extension of the business, and that it will appear by reference to the said increases of salary, that the salary which has increased in the largest proportion of all, is that of William Harry Francis, a brother of the plaintiff, and a son of Isaac H. Francis, deceased. Robert D. Hopkins and Walter Hopkins adopted the answer of the defendant corporation.

The only testimony offered by the plaintiff was that of Dr. Arthur Williams with reference to the illness of Isaac H. Francis, who said Mr. Francis was totally disabled physically, a year before his death—and that for one year previous to September, 1904, he was so far physically disabled as to give only about two-thirds of his time to the business, going to it about ten a. m. and leaving about four p. m. The plaintiff also put in evidence, the minutes of various meetings of the directors, showing who was present, and what was done at those meetings.

Robert D. Hopkins and Walter Hopkins testified for the defendants explaining the services rendered by themselves, and by Isaac H. Francis from time to time to the company, and the character and extent of the business, and of its increase, as well as the increase in profits. Each of them said that he did not vote at any time upon the increase of his own salary.

It was shown that ever since 1900, Robert D. Hopkins bought all the goods for the company, involving the exercise of wide knowledge and sound judgment; and that these purchases amounted to over half a million dollars a year; that he had sole charge of the financial end of the concern, borrowing large sums of money for the business of the firm, and individually indorsing the firm paper to the extent of $200,000 at one season.    It was shown that Walter Hopkins attended personally to the selling of the goods and the supervision of subordinate salesmen; that he sold from $175,000 to $250,000 of goods annually, and also designed all the styles.

It was shown from the books of the company that the net sales for the year ending June 30th, 1907, were $907,000 and the net profits on sales $89,214.19.    Mr. Samuel Rosenthal, of Strauss Brothers, the second largest clothing manufacturing firm in Baltimore, testified in view of the capital, net sales and profits of the Brigham-Hopkins Company as proved in the case, that the salaries of Robert D. and Walter Hopkins objected to, were reasonable and fair; indeed "extremely moderate," and that they were under paid instead of over paid.

Wm. P. Montague, a straw hat manufacturer of New York City, and also president of the Montague and Gillet Co., a New Jersey corporation, doing business in Baltimore City, and formerly connected with the Brigham-Hopkins Company, testified that he knew Robert D. Hopkins and regarded him as about the most able man in his line of business; that he was the back bone of that concern, and that assuming the capital, net sales and profits to be as stated, he considered a salary of $16,000 for him, and $11,000 for Walter Hopkins to be very moderate.

The foregoing statement of the pleadings and of the testimony fairly presents the case as presented to the Court below.

The learned Judge filed a very careful and elaborate opinion in which he reviewed all the evidence, and carefully considered the law applicable thereto, and held (1) that the salaries objected to were not excessive and unreasonable, but

were just and proper; (2) that they were not invalid because only three members of the board were present when they were voted. His conclusion upon this point was expressed in these words, having special reference to all the facts in this case: "It seems to me that even where one votes for his own salary in a board where *he is given the authority to act by the by-laws adopted by the stockholders, and his vote is essential,* the act so done should not be absolutely void, but should be subject to close scrutiny by the Courts with the burden of proof upon the person benefited by the act, to show that it was just and proper, and that no advantage was taken of the stockholders;" and we concur in this view of the law. (3) He held that the provision of the by-law that the offices should be filled before the salaries were fixed was not mandatory but directory merely.

The reasons for these conclusions are stated with such clearness and so well supported by authority that we are satisfied no additional force could be added to them by any opinion we might file in the case. We will therefore affirm the decree of the Court below for the reasons set out in the opinion of that Court, which we will adopt, and request the Reporter to include in the report of this case.

*Decree affirmed with costs above and below.*