*Cherington Condominium v. Heather Kenney*
No. 157, Sept. Term, 2021
Opinion by Leahy, J.

**Corporations and Associations > Directors > Business Judgment Rule**
The business judgment rule has its origins in the common law. *See Oliveira v. Sugarman*, 451 Md. 208, 228 (2017) (referring to "our common-law business judgement rule").

**Corporations and Associations > Directors > Interested Directors**
Under the "interested director" rule, a party may make a showing that a director has a conflict of interest relating to the board's decision—i.e., that the director, or someone close to that director, has a personal financial interest in the outcome of the board's decision. *See, e.g.*, *Francis v. Brigham-Hopkins Co.*, 108 Md. 233, 269 (1908) (directors voting for their own salaries). If a party makes this initial showing of a conflict of interest, then the burden shifts to the board to "show that it was just and proper, and that no advantage was taken of the stockholders." *Id.*

**Corporations and Associations > Directors > Interested Directors > Common Law**
Originally, "[a]t common law, a transaction between a corporation and one or more of its directors was either void or voidable and could be rescinded in a stockholder's suit. In reviewing these transactions, the courts leaned heavily on fiduciary principles developed in the law of trusts." *Indep. Distribs. Inc. v. Katz*, 99 Md. App. 441, 455 (1994) (quoting James J. Hanks Jr., *Maryland Corporations Law* § 6.22a, at 211 (Supp. 1992)).

**Corporations and Associations > Directors > Interested Directors**
Section 2-419 of the Corporations and Associations Article does modify the common law in some respects, including that it offers a corporate board a way to avoid the burden of proving that the contract or transaction was fair and reasonable to the corporation: if the board or the stockholders are properly informed of the conflict of interest, then the contract or transaction may be authorized, approved, or ratified by a majority of the disinterested board members or stockholders, and this will have the same effect as a showing that "[t]he contract or transaction is fair and reasonable to the corporation." Maryland Code (1975, 2014 Repl. Vol.), Corporations and Associations Article § 2-419(b); 6 Maryland Law Encyclopedia, *Corporations* § 165 (2022).

**Corporations and Associations > Directors > Interested Directors > Common Law**
In Delaware, despite the codification of a version of the interested director transaction rule, the courts still sometimes review interested director transactions under a "common-law fiduciary review." R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 4.16 (4th ed. Supp. 2022). Because we are

not aware of any Maryland decisions taking an alternate approach, we will follow the Delaware authorities' lead and conclude that general fiduciary principles inform our application of the common law interested director transaction rule in this case.

**Corporations and Associations > Directors > Interested Directors > Condominium Associations**

When condominium association boards rely on the benefit of the business judgment rule, then under a commonsense application of the law, they must also contend with its limitations, including the interested director transaction rule.  To hold otherwise would be contrary to the basic principles of corporate and fiduciary law through which both the business judgment rule and the interested director transaction rules were developed.  *See, e.g.*, *Oliveira v. Sugarman*, 451 Md. 208, 228 (2017); *Indep. Distribs., Inc. v. Katz*, 99 Md. App. 441, 455 (1994).

**Corporations and Associations > Directors > Interested Directors > Condominium Associations**

Under the plain language of Maryland Code (1975, 2014 Repl. Vol.), Corporations and Associations Article ("CA"), § 2-419, transactions may include those that are just "between a corporation and any of its directors" in addition to those "between a corporation and any other corporation, firm, or other entity in which any of its directors is a director or has a material financial interest."  CA § 2-419(a).  The assessment by the Association against certain of its members (the garden-style unit owners), allegedly for the benefit of board members (townhouse unit owners), is similar to a transaction between "a corporation and any of its directors."

**Corporations and Associations > Directors > Interested Directors > Condominium Associations**

Merely showing that the members of a condominium board have an interest in an assessment is not enough to trigger the interested director transaction rule.  A challenger must either show that the board members have a direct financial stake in a direct transaction or contract with board members or with another company or entity; or, as in this case, an assessment that allegedly benefits the board members to the detriment of unrepresented members.

Circuit Court for Montgomery County
Case No. 477679V

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 157

September Term, 2021

_____

CHERINGTON CONDOMINIUM

v.

HEATHER KENNEY

_____

Leahy,
Zic,
Sharer, J. Frederick
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Leahy, J.

_____

Filed: March 31, 2022

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Conflicts between condo associations and their members are legend—ranging from the tragic, as when buildings collapse, to the trivial, as famously depicted on *Seinfeld*.[1] While this case doesn't fall on either end of the spectrum, it presents an interesting legal issue for the parties, and condominium associations generally, at the intersection of the business judgment rule and the interested director transaction rule.

The Cherington Condominium Association ("the Association"), appellant in this case, governs a community of 99 residential units in Montgomery County. Eighty-seven of these units are townhouses, and the remaining twelve are "garden style" units in an apartment building. Heather Kenney, appellee, lives in one of the garden style units.

In January 2019, Ms. Kenney filed an administrative complaint with the Commission on Common Ownership Communities for Montgomery County, Maryland ("CCOC"), alleging that the Association's 2019 budget violated the Cherington Condominium Declaration and bylaws. Pertinent to this appeal, Ms. Kenney alleged that the Association's board of directors ("the Board") violated the community's bylaws by requiring all residents, including those like her who live in the garden style units, to

---

[1] *Morty Seinfeld:*     *Barefoot in the clubhouse?  Kramer, don't you realize this is against the rules?*

*Cosmo Kramer:*     *Well, I couldn't find my shoes.*

*Jerry Seinfeld:*     *Kramer, these people work and wait their whole lives to move down here, sit in the heat, pretend it's not hot, and enforce these rules.*

*Seinfeld: The Wizard* (NBC television broadcast Feb. 26, 1998).

contribute financially to the maintenance of outdoor spaces around the townhouse units (the "Lawn and Garden Areas"). The Board entered into a contract with AW Landscaping to carry out this maintenance. We refer to the Board's decision to enter into the contract with AW Landscaping as well as the assessments that it imposed in the 2019 budget relating to the Lawn and Garden Areas, collectively, as the "AW Landscaping Assessment."[2] Notably, all members of the Board lived in townhouse units.

The CCOC dismissed Ms. Kenney's complaint, concluding that the increase in assessments against the owners of the garden style units was authorized by the Association's declaration and bylaws. Ms. Kenney petitioned for judicial review in the Circuit Court for Montgomery County. Following a hearing on the record, on March 5, 2021, the circuit court issued an order and memorandum opinion in which it determined that the AW Landscaping Assessment was "self-interested" and remanded the case to the CCOC for further factfinding. The Association appealed and now presents this Court with one issue:

> "Whether the circuit court erred when it ignored the business judgment [r]ule—and instead sua sponte applied an interested director transaction standard to the Board's decision to maintain the Lawn and Garden Areas— and then remanded the case to the CCOC for further proceedings, even though no evidence of fraud or bad faith had been presented at the [e]videntiary hearing already held by the CCOC?"

---

[2] The record indicates that the AW Landscaping contract accounts for all of the costs associated with the landscaping and maintenance of the Lawn and Garden Areas, but because these facts were not fully explored by the CCOC, it is possible that additional sources may be identified on remand.

2

We conclude that the circuit court did not err. We hold that Ms. Kenney's initial showing that the Board members may have personally benefited from the AW Landscaping Assessment to the detriment of the garden-style unit owners (who were not represented on the Board) triggered the interested director transaction rule requiring the Association to show that the Board's decision was fair and reasonable. Because the CCOC failed to address the factual matters necessary to make this determination, its final decision was not supported by substantial evidence. Accordingly, we affirm the judgment of the circuit court remanding the case to the CCOC for further proceedings.

## BACKGROUND

### Administrative Proceedings

The Cherington Condominium Association is run by a board of directors which is comprised of members elected from among the residents of the community. Among the primary duties of the Board is the collection of monthly assessments from the residents of the community to pay for common expenses. Each year, the Board adopts a budget allocating funds to pay these common expenses.

On January 11, 2019, Ms. Kenney filed a complaint with the CCOC alleging that the budget adopted by the Board for 2019 violated the Association's declaration and bylaws. The monthly assessments for the Townhouse Units increased from $200 to $247—a 23.5% increase—whereas the monthly assessments for the Garden Units went from $240 to $352—a 46.7% increase. Among other claims, Ms. Kenney alleged that the expenses added against the Garden Units "are a clear sign of discrimination." And, of particular relevance in the instant appeal, she also alleged that the AW Landscaping Assessment

3

violated the bylaws because the 2019 budget required all residents, including those in the garden units, to contribute to the maintenance of certain outdoor spaces around the townhouses. Specifically, there was a line item in the budget allocating $42,700 for "grounds/landscaping."[3]

In a memorandum of law filed in response to Ms. Kenney's administrative complaint, the Association asserted that "[t]he governing documents [of the Association] grant the Board the legal authority to authorize the Association to maintain . . . all the landscaping in the community." In support of this assertion, the Association cited to Article V § 13(a)(v) of the bylaws, which authorizes the Board to elect to maintain the "Lawn and Garden Areas" within the townhouse units:

> The Association may elect, as determined by the Board of Directors in its sole discretion, to maintain the Lawn and Garden Area within any one or more of the Townhouse Units, as provided below. The Board of Directors may elect, in its sole discretion, to assume such maintenance responsibilities with respect to the Lawn and Garden Area as the Board may deem necessary or appropriate, including, without limitation, responsibility for mowing, fertilizing, trimming, pruning, and/or otherwise maintaining the grass, trees, shrubs, and other planted materials, and any replacements thereof, as may be located within the Lawn and Garden Area.

The Association also cited Article V § 13(b)(i) of its bylaws, which states:

> Except for the portions of a Townhouse Unit required or authorized to be maintained by the Association, each Townhouse Unit Owner shall be responsible for the maintenance, repair and replacement, at his or her expense, of such Townhouse Unit and all improvements therein and

---

[3] Ms. Kenney also challenged the Board's decision to charge the garden-style units for gutter cleaning. The CCOC stated that "[i]t is not clear that the [Board] ha[s] the authority to do so[.]" The circuit court found that "the cost of maintaining and cleaning the townhouse gutters is not a common expense which may be assessed to the garden-style unit owners" and remanded that issue to the CCOC for "further hearing to calculate the appropriate deduction." The Association does not challenge that ruling in this appeal.

4

components thereof, including, without limitation, the following: . . . all driveways, garages, patios, terraces, decks, balconies, **landscaping, front, rear and side (if applicable) yard areas (except to the extent maintained by the Association)**, . . . and other components of such dwelling which are located within the boundary of such Townhouse Unit and/or in a Limited Common Element designated in the Declaration or on the Condominium Plat as being appurtenant to that Townhouse Unit and which serve that Unit and no other.

(Emphasis added).

The Association also noted that its declaration provides that "any portion of a Townhouse Unit which is enclosed by a wall, fence or other obstruction and which is not readily accessible to the Association, as determined by the Board of Directors in its sole discretion, shall not be considered a Lawn and Garden Area."

The bylaws state that the Association and its agents and employees "shall have an irrevocable right and an easement to enter the Lawn and Garden Area within any Townhouse Unit for purposes of maintaining [the] Lawn and Garden Area in accordance with the Bylaws."

The CCOC held a public hearing on October 22, 2019. Ms. Kenney contended that the terms of the Association's governing documents prohibited an increase in the assessment of more than 25% and that the Association did not adopt the 2019 budget in good faith. In presenting her case, Ms. Kenney called several members of the Board in order to ask them questions about documents that she had obtained through discovery. She asked Mr. Steven Wathen, President of the Association, about the language contained in the Association's contract with AW Landscaping that provided for services in "townhouse fronts, and *accessible rear yards*." (Emphasis added). Mr. Wathen replied, "I read that as

5

all common [areas]." Commissioner Staci Gelfound of the CCOC later observed, without challenge, that the landscaping contract did not split the services, so it was not possible to tell how much of the total $42,700 was spent on maintaining the front and accessible rear yards of the townhomes.

Mr. Wathen was also asked about the composition of the Board. He stated that during his tenure as president of the Board, there had never been any garden unit owners on the Board. He said that this was because no garden unit owners had ever nominated themselves as candidates for positions on the Board despite the fact that all members of the community had been invited to do so, including Ms. Kenney and the other garden unit owners.

The Association presented the testimony of Glenn Loveland, managing agent for the Association, who worked on preparing the 2019 budget for the Board's review. Mr. Loveland claimed that landscaping the front of the townhouse units was done "to maintain the uniform appearance throughout the community." Mr. Loveland claimed that there were no expenses in the budget (including, presumably, maintenance of the Lawn and Garden Areas) that were solely for the benefit of the Townhouse Units; rather, it was "primarily for [the benefit of] the community." Mr. Loveland also asserted that the budget was created in good faith, and that he believed the budget to be "in the best interest of the entire community."

The CCOC issued a written decision on December 17, 2019, in which it made the following findings of fact:

The Cherington Condominium Association was created in 1997. The community is comprised of 99 residential units. There are 87 townhouse units and 12 units in an apartment building that are called "garden style" units. All 99 units have the same percentage of ownership. Ms. Kenney owns a garden style unit.

The townhouse units include their exterior walls and roofs and the unit owners are responsible for maintenance of the entire structure and patios and driveways. They are also separately metered for electricity and water and pay for those utilities directly.

The garden style units include only the interior walls, floor and ceiling. The halls, stairways, building exterior including balconies and roof are limited common elements appurtenant to the units in the building and the Association is responsible to maintain, repair, and replace the limited common elements. . . .

Ms. Kenney objected to changes in the Association budget for 2019 including specific expenses charged to garden style unit owners and not to townhouse unit owners.

During 2018, the Board reviewed the financial records for previous years, vendor contracts and a new reserve study in preparation for drafting the 2019 budget. The reserve study identified infrastructure replacements that will be necessary and for which there would not be sufficient funding. The Board also determined that the garden style units were not being assessed the full amount necessary to pay for the maintenance of their limited common elements and their shared utilities. The 2019 budget addressed some of these issues and resulted in an increase in the assessments for the garden style units.

The Cherington Condominium Declaration, at Article III, §2 regarding limited common elements, authorizes the Board in its sole discretion, to assess the garden style unit owners the costs of the use and maintenance of the limited common elements.[4] The Bylaws at Article V, § 1(g) authorize assessment of the cost of commonly metered utilities against the units based on usage rather than ownership, thus permitting these costs to be assessed against the garden style units.

---

[4] Although the CCOC found that the Board has authority to "assess the garden style unit owners the costs of the use and maintenance of the limited common elements," that finding does not apply to the Lawn and Garden Areas, which the parties agree are not limited common elements.

7

It has not been alleged that the amounts included in the budget as assessments against the garden style units did not accurately reflect the true costs of the budgeted items. In light of the increase to the garden style unit assessments the covered expenses were broken out and listed separately.

The budget increase was in the budget adopted for the year and not in a special assessment as described in the Bylaws at Article V, § 4, or an unbudgeted expenditure as described in the Maryland Condominium Act at § 11-109 (d) so there is no requirement for special authorization for an increase that exceeds 15%.

The record indicates that some of the garden style unit owners are dissatisfied with the services being provided. It also indicates that in the past year the Board has been available to discuss these issues and hopefully improve the quality of these services. The percentages make it unlikely that the garden style unit owners will have representation on the Board so it behooves the Board to be available to hear their concerns and to work with these owners to address their issues.

Under the heading "Conclusions of Law," the CCOC concluded that "[t]he increase in assessments of the garden style unit owners as presented in this record is authorized by the Cherington Condominium Declaration and Bylaws as discussed above."

### Circuit Court Proceedings

Ms. Kenney filed a petition for review from the CCOC's decision in the Circuit Court for Montgomery County, and the court heard arguments from the parties on February 3, 2021. During this hearing, counsel for the Association argued that the AW Landscaping Assessment must be given deference under the business judgment rule. The court responded:

Right. So, let me ask you about the business judgment rule, because I saw that and it seemed to me that the one thing that comes up here is that if you're going to apply the business judgment rule, then you also have to apply the interest in [sic] directors sort of provisions also, because, certainly, Maryland corporate law provides that where you have interested director transactions, then they can only go forward if they're approved by any disinterested

8

directors, which, in this case, I don't think there are any, because everybody's financially benefited by this provision that they passed, all the members of the association, [B]oard of directors.

***

And, then, the only other way to get it is that it must be fair, and reasonable, and in the best interest of the association, or the disinterested shareholders, if it was a corporation, would have to approve it. So, I don't know if the business judgment rule gets you where you want to go, because you have disinterested director problems.

***

There was nothing in the record about the landscaping, or the gutters, or how that was pro rata between the garden apartments and the townhomes, just that there's sort of this overlap payment in there, so there's some concern that the members are directing that payments that benefit them that are discretionary are being done potentially to the detriment of the garden apartment owners.

Counsel for the Association replied:

So, I think, as far as I know, that would be new, and that's an interesting point. I guess my thoughts on it are, you know, typically, when I think of that interested director, I think of more, not setting up a budget, but more of a transaction or a contract entering in like a family member or something like that. You know, coming up with a budget to me I don't know that that fits within it[.]

The circuit court issued a written opinion on March 5, 2021. In its opinion, the court concluded that "the CCOC failed to determine whether the Board was authorized to assess the cost of lawncare for the townhouse units onto the garden-style unit owners." Specifically, the court stated:

In its [o]pinion, the CCOC did not come to a conclusion as to what amount of this lawncare may be undertaken by the Association nor did it specifically address whether the landscaping fee that was assessed onto the garden-style unit owners included the maintenance of the individual townhouse units. **Moreover, because the Board is comprised entirely of townhouse unit owners, the Board's exercise of discretion is self-interested, and therefore, there must be evidence that assessing these costs onto the garden-style units is fair and reasonable.**

9

(Emphasis added).  Accordingly, the circuit court remanded the case to the CCOC for it to "determine the extent that landscaping is provided to the individually owned townhouse units and whether such an arrangement is fair and reasonable to the entire community including the garden-style unit owners."

The Association filed a timely notice of appeal to this Court on April 2, 2021.

## DISCUSSION

## I.

## Interested Directors and the Business Judgment Rule

### A.    Parties' Contentions

Before this Court, the Association argues that "[t]he Board's decision to maintain the Lawn and Garden Areas is expressly contemplated by the Association's recorded governing documents and a business judgment that the CCOC and circuit court are obligated to respect."  In the Association's view, Article I § 6 of the declaration and Article V § 13(a)(v) of the bylaws authorize the Association to assume responsibility for maintaining the Lawn and Garden Areas so that it may "have one landscaping contract for the community that allows for mowing and other maintenance of the community grounds as well as the readily accessible yards of the Townhouse Units[.]"

The Association urges that judicial review of the AW Landscaping Assessment is significantly limited by the business judgment rule.  According to the Association, there is no dispute that the Board is authorized to maintain the Lawn and Garden Areas under the Association's governing documents, and Ms. Kenney failed to "produce *any* evidence that

10

the Board acted in bad faith or with fraud." (Emphasis in original). Relying on *Black v. Fox Hills North Community Association, Inc.*, 90 Md. App. 75 (1992), the Association posits that "the interpretation of the Association's Declaration and Bylaws rests with the Board and neither that interpretation nor the Board's ultimate decision should be disregarded." The interested director transaction rule, says the Association, only applies to transactions between the corporation and another party, which is either a director or an entity in which a director has a material financial interest. Here, the Association's budget did not constitute a transaction with any other party, so the interested director transaction rule does not apply to this case.

To the contrary, Ms. Kenney asserts that because every member of the Board lived in a townhouse unit, the directors all had a financial interest in increasing the assessments against the owners of the garden-style units because doing so would lessen the directors' financial burden in maintaining the outdoor areas around the townhouses. Therefore, because the Board was "composed entirely of interested directors," it was subject to the interested director transaction rule. Under that rule, Ms. Kenney contends, the "interested directors bear the burden of proving that the transaction between corporation and directors or entity in which directors have a material financial interest is fair and reasonable to the corporation[.]"

The question of whether a Board action is fair and reasonable, Ms. Kenney avers, is "largely a question of fact to be determined from the objective facts and surrounding circumstances." She points out that, in her complaint and at the hearing before the CCOC, she presented and preserved issues related to the Board's decision to provide landscaping

11

and gutter cleaning services to the townhouse units. Ms. Kenney contends, however, that "the CCOC never determined: (1) what amount of townhouse unit lawncare may be undertaken by the Association; nor (2) whether the landscaping fee that was assessed onto garden style unit owners included maintenance of the individual townhouse units." According to Ms. Kenney, "[t]he CCOC did not [] address the landscaping issues in its decision, let alone weigh the important considerations required by the interested director transaction standard." Because the CCOC did not determine whether the AW Landscaping Assessment was fair and reasonable, Ms. Kenney argues, the circuit court was correct to remand the case to the CCOC to make that determination.

In response to the Association's argument that the 2019 budget was not a "transaction" as contemplated under the interested director transaction rule, Ms. Kenney asserts that the Board's budgetary decisions are such "transactions" because they are undertaken pursuant to the Condominium's declaration and bylaws "which are contracts between the [A]ssociation and individual unit owners." In Ms. Kenney's view, when the Board makes a decision regarding the payment of assessments to the Association, that is a "discharge of contractual obligations" and constitutes a transaction between the Association and the unit owners.

In reply, the Association directs us to a decision of the Nebraska Supreme Court for the persuasive value of its holding that when a corporate action is "the result of an internal decision by the corporation, instead of a bilateral arrangement with another party," the action does not qualify as a transaction. *Glad Tidings Assembly of God v. Neb. Dist. Council of the Assemblies of God, Inc.*, 734 N.W.2d 731, 739 (Neb. 2007). The Association

12

avers that "a transaction involves negotiations, and bilateral arrangements, not simply a unilateral act by a corporation." The Association also cautions us that if the interested director transaction rule applies in this case, then "nearly every (if not every) decision of a board of directors of a community association will constitute an interested director transaction. Only unit owners may serve on the Board of Directors and thus every potential Director is financially impacted by any budgeting or assessment decision the Board is asked to make."

## B.      Analysis

### *Legal Framework*

In an appeal from the decision of an administrative body such as the CCOC, our review is "limited to determining whether 'there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.'" *Md. Real Estate Comm'n v. Garceau*, 234 Md. App. 324, 349 (2017) (quoting *Regan v. Bd. Of Chiropractic Exam'rs*, 120 Md. App. 494, 508 (1998)). As the Court of Appeals has recently emphasized, under the "substantial evidence test," we consider whether the administrative body's decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Mayor & City Council of Balt. v. ProVen Mgmt., Inc.*, 472 Md. 642, 667 (2021) (quoting *Bulluck v. Pelham Wood Apartments*, 283 Md. 505, 512 (1978)).

The business judgment rule is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief

13

that the action taken was in the best interests of the company. Absent an abuse of discretion, that judgment will be respected by the courts. The burden is on the party challenging the decision to establish facts rebutting the presumption." *Boland v. Boland*, 423 Md. 296, 328 (2011) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)).

The business judgment rule has its origins in the common law. *See Oliveira v. Sugarman*, 451 Md. 208, 228 (2017) (referring to "our common-law business judgment rule"). It has since been codified in Maryland Code (1975, 2014 Repl. Vol., 2021 Supp.), Corporations and Associations Article ("CA"), section 2-405.1, which states:

> (c) *In general.* — A director of a corporation shall act:
>    (1) In good faith;
>    (2) In a manner the director reasonably believes to be in the best interests
>        of the corporation; and
>    (3) With the care that an ordinarily prudent person in a like position would
>        use under similar circumstances.
>
>                     \* \* \*
>
> (g) *Presumption of compliance.* — An act of a director of a corporation is
>     presumed to be in accordance with subsection (c) of this section.

*See also* Maryland Code (1973, 2020 Repl. Vol.), Courts and Judicial Proceedings Article ("CJP"), § 5-417(b) ("A present or former director of a corporation who while a director acts or acted in accordance with the standard of conduct provided in § 2-405.1 of the Corporations and Associations Article has no liability in any action based on an act of the director.").

There are two ways in which a party may overcome the presumptions of the business judgment rule. First, the party may make a showing of "fraud or bad faith." *Reiner v.*

14

*Ehrlich*, 212 Md. App. 142, 155 (2013). If the party does so, then the business judgment rule does not apply. *Id.* at 156-57. Second, under the "interested director" rule, a party may make a showing that a director has a conflict of interest relating to the board's decision—i.e., that the director, or someone close to that director, has a personal financial interest in the outcome of the board's decision. *See, e.g.*, *Francis v. Brigham-Hopkins Co.*, 108 Md. 233, 269 (1908) (directors voting for their own salaries). If a party makes this initial showing of a conflict of interest, then the burden shifts to the board to "show that it was just and proper, and that no advantage was taken of the stockholders." *Id.*

The interested director transaction rule was first developed as part of the common law. Originally, "[a]t common law, a transaction between a corporation and one or more of its directors was either void or voidable and could be rescinded in a stockholder's suit. In reviewing these transactions, the courts leaned heavily on fiduciary principles developed in the law of trusts." *Indep. Distribs. Inc. v. Katz*, 99 Md. App. 441, 455 (1994) (quoting James J. Hanks Jr., *Maryland Corporations Law* § 6.22a, at 211 (Supp. 1992)); *see also Ross Transp., Inc. v. Crothers*, 185 Md. 573, 583 (1946) ("It has long been the law in this State that trustees cannot purchase at their own sale, and trustees in this sense, include directors of corporations."); *Veterans' Admin. v. Hudson's Estate*, 169 Md. 141, 147 (1935) (stating, in a case relating to the fiduciary role of a guardian and trustee, that "[n]o fiduciary has a right, nor will he be allowed, to enter into any engagements or assume any position in which he has a personal interest conflicting with, or which may possibly conflict with the interests of those whom he is bound to protect.").

15

Over time, the common law interested director transaction rule went through a "metamorphosis." *Sullivan v. Easco Corp.*, 656 F. Supp. 531, 533 (D. Md. 1987). In *Chesapeake Construction Corp. v. Rodman*, the Court of Appeals described this shift in the law:

> While at one time our predecessors seemed to favor setting aside such transactions [here, a contract through which the corporation purchased property from a director] upon the application of an interested party regardless of the question of fairness to the corporation, it is now well settled that a transaction such as the one before us will always be closely scrutinized and, if shown to be unfair or entered into in bad faith by the corporate officer, nullified. And, as observed by Judge Powers, the burden of proving that the contract is fair, adequate and equitable is upon the officer or director.

256 Md. 531, 536 (1970). In other words, the rule was no longer that interested director transactions were automatically void or voidable—rather, once the party challenging the decision made an initial showing that there was a conflict of interest, the burden would shift to the board to prove that the decision was still fair and equitable despite the conflict of interest. *Id.*; 6 Maryland Law Encyclopedia, *Corporations* § 165 (database updated March 2022).

Over a century ago, in *Francis v. Brigham-Hopkins Co.*, the Court of Appeals considered a challenge to the decision by the board of a corporation to significantly increase the salaries of its president and treasurer while they were in office. 108 Md. at 264-65. Although the Court affirmed the trial court's holding that the salary increases were "just and proper," the Court nevertheless held that the corporation bore the burden of defending its action. *Id.* at 268-69. Quoting the trial court, the Court of Appeals explained:

> The learned [trial] judge filed a very careful and elaborate opinion in which he reviewed all the evidence, and carefully considered the law applicable

16

thereto, and held . . . [that]: "It seems to me that even where one votes for his own salary in a board where he is given the authority to act by the by-laws adopted by the stockholders, and his vote is essential, the act so done should not be absolutely void, but should be subject to close scrutiny by the courts, with the burden of proof upon the person benefited by the act, to show that it was just and proper, and that no advantage was taken of the stockholders"— and we concur in this view of the law.

*Id.*

In 1976, the General Assembly codified a version of the interested director transaction rule. 1976 Md. Laws, ch. 567. Having withstood the test of time, the interested director transaction statute still provides, as when it was first enacted nearly 50 years ago:

(a) *General rule.* — If subsection (b) of this section is complied with, **a contract or** *other transaction between a corporation and any of its directors* <u>or</u> **between a corporation and any other corporation, firm, or other entity** in which any of its directors is a director or has a material financial interest is not void or voidable solely because of any one or more of the following:
  (1) The common directorship or interest;
  (2) The presence of the director at the meeting of the board or a committee of the board which authorizes, approves, or ratifies the contract or transaction; or
  (3) The counting of the vote of the director for the authorization, approval, or ratification of the contract or transaction.
(b) *Disclosure and ratification.* — Subsection (a) of this section applies if:
  (1) The fact of the common directorship or interest is disclosed or known to:
    (i) The board of directors or the committee, and the board or committee authorizes, approves, or ratifies the contract or transaction by the affirmative vote of a majority of disinterested directors, even if the disinterested directors constitute less than a quorum; or
    (ii) The stockholders entitled to vote, and the contract or transaction is authorized, approved, or ratified by a majority of the votes cast by the stockholders entitled to vote other than the votes of shares owned of record or beneficially by the interested director or corporation, firm, or other entity; **<u>or</u>**
  (2) The contract or transaction is fair and reasonable to the corporation.

17

(d) *Burden of proof; fixing of compensation.* — (1) If a contract or transaction is not authorized, approved, or ratified in one of the ways provided for in subsection (b)(1) of this section, the person asserting the validity of the contract or transaction bears the burden of proving that the contract or transaction was fair and reasonable to the corporation at the time it was authorized, approved, or ratified.

(2) This subsection does not apply to the fixing by the board of directors of reasonable compensation for a director, whether as a director or in any other capacity.

CA § 2-419(a)-(b), (d) (emphasis added); *see also* 6 Maryland Law Encyclopedia, *Corporations* § 166 (database updated March 2022).

It is a "rule of law that statutes are not presumed to repeal the common law 'further than is expressly declared, and that a statute, made in the affirmative without any negative expressed or implied, does not take away the common law.'" *Genies v. State*, 196 Md. App. 590, 605-06 (2010) (quoting *Robinson v. State*, 353 Md. 683, 693 (1999)). Section 2-419 does not specify that it was intended to fully replace the common law interested director transaction rule, and in substance, it is largely consistent with the common law. CA § 2-419. It does modify the common law in some respects, however, including that it offers a corporate board a way to avoid the burden of proving that the contract or transaction was fair and reasonable to the corporation: if the board or the stockholders are properly informed of the conflict of interest, then the contract or transaction may be authorized, approved, or ratified by a majority of the disinterested board members or stockholders, and this will have the same effect as a showing that "[t]he contract or transaction is fair and reasonable to the corporation." CA § 2-419(b); 6 Maryland Law Encyclopedia, *Corporations* § 165 (2022) ("The enactment in 1976 of the statute governing

interested director transactions established some additional rules, as an interested director no longer bears the burden of proving the fairness and reasonableness of a contract with the corporation, so long as the contracting director's interest was disclosed to the board of directors, and the contract was authorized, approved or ratified." (footnotes omitted)).

In Delaware, the parallel provision of its state law "has been interpreted as dealing *solely with the problem of per se invalidity*; that is, as addressing only the common law principle that interested transactions were entirely invalid and providing a road map for transactional planners to avoid that fate." *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 614-15 (Del. Ch. 2005) (citing Del. Code Ann. tit. 8, § 144 (West 1998)); Leo Strine et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 Geo. L.J. 629, 656-57 n.85 (2009) ("To date, the Delaware courts have generally read the statute more narrowly, while drawing on it in crafting rulings in equity.").[5]  In

---

[5] Del. Code Ann. tit. 8, § 144 (2010), which is quite similar to CA § 2-419, states:

(a) No contract or transaction between a corporation and 1 or more of its directors or officers, or between a corporation and any other corporation, partnership, association, or other organization in which 1 or more of its directors or officers, are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the board or committee which authorizes the contract or transaction, or solely because any such director's or officer's votes are counted for such purpose, if:

    (1) The material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract or transaction by

(Continued)

19

Delaware, despite the codification of a version of the interested director transaction rule, the courts still sometimes review interested director transactions under a "common-law fiduciary review." R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 4.16 (4th ed. Supp. 2022). Because we are not aware of any Maryland decisions taking an alternate approach, we will follow the Delaware authorities' lead and conclude that general fiduciary principles inform our application of the common law interested director transaction rule in this case.

We next observe that the Association's question presented is framed in a manner that suggests the business judgment rule and the interested director transaction rule are mutually exclusive,[6] and its brief contends that the circuit court incorrectly "conflate[d] the

---

the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or

(2) The material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the stockholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the stockholders; or

(3) The contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified, by the board of directors, a committee or the stockholders.

(b) Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or of a committee which authorizes the contract or transaction.

[6] The question asks "[w]hether the circuit court erred when it **ignored the business judgment [r]ule—and instead sua sponte applied an interested director transaction standard** to the Board's decision to maintain the Lawn and Garden Areas . . . ." (Emphasis added).

requirements" of the two rules. Contrary to the Association's framing, however, the business judgment rule and the interested director transaction rule—which both appear under the same subtitle of the Corporations and Associations Article—are two non-exclusive parts of the same analytical framework. The business judgment rule creates a presumption that directors are acting in accordance with their fiduciary duties of care and loyalty. CA § 2-405.1(g). The interested director transaction rule operates as a brake on that presumption when conflicted director transactions are present, requiring that either (1) the conflicts be disclosed and approved, CA § 2-419(b)(1), or (2) the transaction(s) implicating those conflicts be shown to be fair and reasonable to the corporation, CA § 2-419(b)(2).

Consistent with its "either or" paradigm, the Association insists that the business judgment rule governs this case and that Ms. Kenney could not defeat the presumption because she "failed to produce *any* evidence that the Board acted in bad faith or with fraud." The Association is correct that rebutting the presumption of the business judgment rule normally requires a plaintiff to assert facts showing bad faith, fraud, or even, a "lack of prudence." *Oliveira*, 451 Md. at 221. However, as we just explained, if a party can make an initial showing that there is a conflict of interest sufficient to trigger application of the interested director transaction rule, then the board must show that the conflict was properly disclosed and approved, or that the "contract or transaction is fair and reasonable to the corporation." CA § 2-419(b)(2). *See generally Shapiro v. Greenfield*, 136 Md. App. 1,

21

14-15 (2000). [7]  This construction of the interested director transaction rule is in harmony with the business judgment rule as codified under CA § 2-405.1 because the presumption only applies when it can be shown that the director acted, not only in good faith, but also in a "manner the director reasonably believes to be in the best interests of the corporation[.]"  Indeed, we have recognized, albeit in dicta, that "self-dealing" is aligned with the bad-faith conduct sufficient to rebut the business judgment presumption.  *See Black v. Fox Hills N. Cmty. Ass'n, Inc.*, 90 Md. App. 75, 82 (1992) ("If the corporate directors' conduct is authorized, a showing must be made of fraud, *self-dealing* or unconscionable conduct to justify judicial review." (quoting *Papalexiou v. Tower West Condominium*, 401 A.2d 280, 285-86 (N.J. Super. 1979) (emphasis added)).

### *Applying the Business Judgment Rule to Condominium Associations*

The Association relies on two Maryland cases—and there are only two—that apply the business judgment rule to homeowners' associations.[8]  However, because neither case

---

[7] *See also Tackney v. U.S. Naval Acad. Alumni Ass'n, Inc.*, 408 Md. 700, 704 (2009).  In *Tackney*, the Court of Appeals held that a corporation's election of trustees was subject to the business judgment rule, but then nevertheless went on to consider whether board members had any undisclosed conflicts of interest that would implicate the interested director transaction rule.  *Id.* at 721.  Although the Court held in that case that there were no undisclosed conflicts of interest, if the facts were different, it could very well have held that the interested director transaction rule applied to rebut the presumption of the business judgment rule, making the board's decision void despite the initial presumption accorded the corporation under the business judgment rule.

[8] We were unable to find any reported opinions in Maryland applying the business judgment rule to condominium associations.  Condominium associations are governed by the Maryland Condominium Act, codified as Title 11 of the Real Property Article, while homeowners' associations are governed by the Maryland Homeowners Association Act, codified as Title 11B of the Real Property Article.

22

involved facts that would lead the courts to apply the interested director transaction rule, they have limited value in our analysis.

The first case in which this Court applied the business judgment rule to a homeowners' association was *Black v. Fox Hills North Community Association, Inc.*, 90 Md. App. 75 (1992). The case began when the plaintiffs asked the association to compel their neighbors to remove a fence they had recently built on their own land. *Id.* at 78. The plaintiffs then filed suit against both the association and the neighbors. There were no allegations that the association acted in bad faith; the complaint alleged only that its actions violated the community's governing documents. *Id.* at 78, 83. When the circuit court granted a motion to dismiss the counts against the association, the plaintiffs appealed to this Court. *Id.* at 79.

This Court affirmed the dismissal of the complaint against the association. *Id.* at 83. We held that because there was no allegation of fraud or bad faith, "the decision to approve the fence was a business judgment with which a court will not interfere." *Id.* There were also no allegations of any conflicts of interest that would have implicated CA § 2-419 or the common law interested director transaction rule.

Notably, in *Black* we never cited to CA § 2-405.1. Instead, we applied the common law business judgment rule, quoting *Martin v. United Slate, Tile & Composition Roofers,*

194 Md. 428, 441 (1950), a Court of Appeals case that was decided before the business judgment rule was codified. *Black*, 90 Md. App. at 81.[9]

We have applied the business judgment rule in a case involving a homeowners' or condominium association only once since *Black*. In *Reiner v. Ehrlich*, the plaintiffs filed a complaint in the Circuit Court for Montgomery County, seeking a declaratory judgment stating that the association violated its governing documents when it denied the plaintiffs' request to install an asphalt roof on their home. 212 Md. App. at 146. As in *Black*, there was no allegation of fraud, bad faith, or any conflict of interest among the members of the board. *Id.* at 156. On appeal of the circuit court's grant of summary judgment against the plaintiffs, we concluded that the case fell "squarely within the purview of *Black*," and that the business judgment rule therefore precluded judicial review of the association's decision.[10] *Id.* at 156.

Returning to the present case, we are presented with facts materially different from those in *Black* and *Reiner*. Although *Black* and *Reiner* firmly established that the business judgment rule applies to decisions by the board of a homeowners' association, those cases contained no allegations of conflict(s) of interest. Therefore, while those cases control our

---

[9] *Black* also cited to *Mountain Manor Realty, Inc. v. Buccheri* in its discussion of the business judgment rule, and that case was decided after the codification of the business judgment rule. 55 Md. App. 185 (1983). Again, notably, *Mountain Manor Realty* did not cite to CA § 2-405.1; instead, like *Black*, it relied on the common law business judgment rule. *Id.* at 194.

[10] In *Reiner*, we noted that "[t]he business judgment rule is also codified by statute." 212 Md. App. at 156 n.3 (citing CJP § 5-417). However, the case did not engage in any analysis of the text of the statutes codifying the business judgment rule, instead relying on the expression of the rule in *Black*, which was drawn from the common law. *Id.* at 155-56.

24

general understanding of the business judgment rule, they do not clarify how the rule intersects with the interested director transaction rule.

When condominium association boards rely on the benefit of the business judgment rule, then under a commonsense application of the law, they must also contend with its limitations, including the interested director transaction rule. To hold otherwise would be contrary to the basic principles of corporate and fiduciary law through which both the business judgment rule and the interested director transaction rules were developed. *See, e.g.*, *Oliveira*, 451 Md. at 228; *Indep. Distribs., Inc. v. Katz*, 99 Md. App. 441, 455 (1994) ("At common law, a transaction between a corporation and one or more of its directors was either void or voidable and could be rescinded in a stockholder's suit. In reviewing these transactions, the courts leaned heavily on fiduciary principles developed in the law of trusts." (citation omitted)).

Just as we turned to the broader principles of the business judgment rule in *Black* and *Reiner,* we return to these broader principles here because the statutes are addressed to commercial corporations, and the concepts associated with commercial corporations are not identical to condominium or homeowners' associations. For example, the statute contains references to stockholders, which a condominium association does not have. Because the statute was written to apply to corporations and its language does not completely pair with the organizational structure of a condominium association, we must look to the broader principles of the common law to supplement the text of the statute. *Genies*, 196 Md. App. at 605-06 ("It is a generally accepted rule of law that statutes are not presumed to repeal the common law 'further than is expressly declared, and that a statute,

25

made in the affirmative without any negative expressed or implied, does not take away the common law.'").

### *Applying the Common Law Interested Director Transaction Rule*

As discussed above, we do not believe that the enactment of CA § 2-419 precludes us from considering the broader principles of the common law interested director transaction rule.[11]

Here, in defining what is meant by "transaction," the Association ignores the common law principles that provide the foundation for CA § 2-419. Moreover, the Association focuses only on the language of the statute that describes transactions between a corporation and another outside party. Under the plain language of CA § 2-419(a), however, transactions may include those that are just "between a corporation and any of its directors" in addition to those "between a corporation and any other corporation, firm, or other entity in which any of its directors is a director or has a material financial interest." CA § 2-419(a). The assessment by the Association against certain of its members (the garden-style unit owners), allegedly for the benefit of board members (townhouse unit owners), is similar to a transaction between "a corporation and any of its directors."

---

[11] This is not the first time that the Maryland courts have recognized the continuing validity of corporate common law after the General Assembly has enacted a statute addressing the same issues. In *Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 336-37 (2009), the Court of Appeals considered whether directors are only bound by the fiduciary duties listed in CA § 2-405.1(a), or if they are still bound by the common law duties that predate the statute. The Court held that "[b]eyond and pre-existing § 2-405.1(a), however, lie additional common law duties[.]" *Id.* at 337.

26

Additionally, the alleged conflict of interest by the Board also arises out of a contract that the Board entered into with a third party—AW Landscaping. Ms. Kenney challenged the Board's decision to increase the assessments for the garden-style units by 47%, but in doing so, she also challenged the Board's authority to enter into a contract with AW Landscaping. That contract is most certainly a "contract or transaction." Moreover, under the bylaws, the Lawn and Garden Areas are not limited common areas, so, unlike other assessments fixed in the bylaws, the Board has to apply its discretion in deciding whether to pay for their upkeep. At the very least, the AW Landscaping Assessment challenged here is a hybrid with elements of a contract between the Association and a third party (the AW Landscaping agreement), and elements of a "transaction" between the Association and its board members (the assessment for landscaping benefitting the board members to the detriment of a group of unrepresented association members).

The Association raises the concern that if we apply the interested director transaction rule in this case, then condominium association boards will be unable to act without judicial scrutiny because they are made up of community members who always have an interest in decisions affecting their community. We agree with the Association that it would be contrary to policy in this State to subject condominium association boards to an unwarranted, inefficient degree of judicial oversight. On the other hand, it cannot be the purpose of the business judgment rule to protect members of a condominium association board, any more than a corporation's directors, if they engage in self-dealing to the detriment of the association's members.

The circumstances of this case are unique because the Board is comprised entirely of members who voted on something that allegedly benefited them all in the same way to the detriment of another group of members who are not represented on the Board. Merely showing that the members of a condominium board have an interest in an assessment is not enough to trigger the interested director transaction rule. A challenger must either show that the board members have a direct financial stake in a direct transaction or contract with board members or with another company or entity; or, as in this case, an assessment that allegedly benefits the board members to the detriment of unrepresented members. Here, the allegation is that the AW Landscaping Assessment, unlike the typical assessment, benefitted all board members (so there could be no vote of disinterested members), to the detriment of the (unrepresented) garden unit owners.

Furthermore, as we have noted, CA § 2-419 modifies the common law by giving corporations the means to avoid the burden of proving that the contract or transaction was fair and reasonable to the corporation by showing that the board or the stockholders were properly informed of the conflict of interest, and a majority of the disinterested board members or stockholders authorized, approved, or ratified the contract or transaction. CA § 2-419(b). We cannot discern any reason why condominium associations cannot also potentially benefit from these safe harbor provisions; the General Assembly chose to

28

modify the law by enacting CA § 2-419, and we see no reason why we should not account for those modifications even when turning to the common law. [12]

## Conclusion

We hold that Ms. Kenney's initial showing that the Board members may have personally benefited from the AW Landscaping Assessment to the detriment of the garden-style unit owners (who were not represented on the board) triggered the interested director transaction rule requiring the Association to prove that the Board's decision was fair and reasonable. She alleged that there were no garden unit owners on the Board, that the budget provided for the maintenance of the Lawn and Garden Areas adjoining the townhouse units, and that the 2019 budget raised the assessments on the garden unit owners by almost twice as much as on the townhouse unit owners—46.7% versus 23.5%. Together, these allegations suggest that the Board members had a personal interest in their decision, and that the AW Landscaping Assessment gave the Board members benefits that were not enjoyed by the garden unit owners, and that worked to the detriment of the garden unit

---

[12] The inability to conduct a vote of the disinterested directors in this case (because there weren't any) makes judicial review all the more significant as a check on the Board's potential conflicts of interest. We acknowledge the Association's argument that if there were garden-style unit owners on the Board then they would be just as interested as the townhouse unit owners, but at the very least, the garden-style unit owners would have a *different* interest in the Board's decisions than the townhouse unit owners do, and that diversity of interests on the Board would lessen our concerns.

29

owners.  Accordingly, the Board's decision must be reviewed under the interested director transaction rule to determine whether it was fair and reasonable.[13]

We agree with the circuit court that the factual issues left unaddressed by the CCOC made it impossible to conclude, on petition for judicial review, whether the AW Landscaping Assessment was fair and reasonable to the Association.  As the circuit court observed, the CCOC "did not come to a conclusion as to what amount of th[e] lawncare may be undertaken by the Association nor did it specifically address whether the landscaping fee that was assessed onto the garden-style unit owners included the maintenance of the individual townhouse units."  Because the CCOC did not make any findings of fact relating to the landscaping contract at all, a reviewing court cannot decide whether the contract was fair and reasonable.  *Sweeney v. Montgomery Cnty.*, 107 Md. App. 187, 198 (1995) ("[B]ecause the [b]oard failed to make crucial factual findings, our only viable alternative is to remand the case to the [b]oard.").

For the foregoing reasons, we affirm the circuit court's decision to remand the case to the CCOC so that the CCOC may make additional factual findings as necessary to determine whether the landscaping contract and related assessments are fair and reasonable

---

[13] To be clear, our opinion does not make or mandate a finding that the Board acted improperly.  Ms. Kenney made a sufficient showing that the Board has a conflict of interest under the interested director transaction rule, but on remand to the CCOC, the Association may satisfy the interested director transaction rule by presenting evidence that the AW Landscaping Assessment was fair and reasonable to the Association and its members.

to the Association and all of its members, and for "further hearing to calculate the appropriate deduction" for the costs of maintaining and cleaning the townhouse gutters.[14]

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE THE DECISION OF THE COMMISSION ON COMMON OWNERSHIP COMMUNITIES FOR MONTGOMERY COUNTY, AND TO REMAND TO THAT COMMISSION FOR FURTHER PROCEEDINGS CONSISTENT WITH THE CIRCUIT COURT'S DECISION AND THIS OPINION; COSTS TO BE PAID BY APPELLANT.**

---

[14] As further explained in note 3 above, the Association does not challenge the circuit court's instruction to remand for additional proceedings based on its finding that "the cost of maintaining and cleaning the townhouse gutters is not a common expense which may be assessed to the garden-style unit owners."